William R. LEACH, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18198.

United States Court of Appeals
District of Columbia Circuit.

April 9, 1964.

As Amended May 11 and 19, 1964.

---

Petition for Rehearing en Banc and Petition for Rehearing by the Division Denied June 11, 1964.

Messrs. Max M. Kampelman and Arnold H. Leibowitz, Washington, D. C. (both appointed by the District Court), were on the motion for appellant.

Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker and Robert D. Devlin, Asst. U. S. Attys., were on the opposition to appellant's motion.

Before BAZELON, Chief Judge, and BASTIAN and WRIGHT, Circuit Judges.

BAZELON, Chief Judge.

When William Leach appeared for sentencing after his conviction for robbery, he asked the judge to refer him for a mental examination. The prisoner said he had twice been under psychiatric care. His lawyer told the court that in the last 31 years, Leach's entire adult life, he had been out of prison only 63 days. The pre-sentence report characterized Leach as "the classical picture of the psychopathic offender." Yet the judge ignored his request for an examination. Alleging this and other errors, Leach appealed. This court held the other errors harmless and affirmed the conviction. Leach v. United States, 115 U.S.App.D.C. 351, 320 F.2d 670 (1963). But we remanded the case to the district judge to reconsider the sentence because there was "no indication here that the court * * * made use of any of the aids to sentencing placed at its disposal by the Congress of the United States. * * * In view of the fact * * * that the record reflects no response on the part of the court to appellant's request for examination prior to sentence, that request may not have been considered." 115 U.S.App.D.C. at 354, 320 F.2d at 673.

On remand, the trial judge reconsidered the sentence without further investigation of any kind, and in particular, without referring the prisoner for a mental examination. The judge reinstated the original sentence.[1] The defendant had no hearing, though he sought one,[2] on the need for a mental examination. Reconsideration of the sentence occurred in the defendant's absence, though Rule 43, F.R.Crim.P., requires his presence "at every stage of the trial * * * including the imposition of sentence." [3] Leach's counsel also was not present at the reconsideration of the sentence, though this was an important step in the proceedings against him. Compare White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963).

The judge gave four reasons for adhering to the former sentence: the probation officer had recommended the maximum sentence and had not himself, as he had power to do (D.C.Code § 24–106), referred Leach for a mental examination; the crime was a serious one; the defendant had a record of repeated robberies; and "there was no competent evidence of any kind prior to, during or after the trial or prior to the imposition of sentence, that the defendant Leach was suffering from any mental illness."

We think these reasons do not support the judge's decision. That the probation officer failed to refer Leach for an examination is no reason for the judge, who is in a supervisory capacity over the officers, to fail also.[4] That the crime was serious and that previous efforts at rehabilitation had collapsed made this the sort of case in which further study was needed.[5] That the judge thought there was no competent evidence of "mental illness" should not have precluded an examination as an aid to sentencing and treatment.[6]

1. United States v. Leach, 218 F.Supp. 271 (D.D.C.1963). The case is before us now on a motion for summary reversal.

2. After remand to the District Court, defense counsel on June 11, 1963, filed a formal motion for mental examination under D.C.Code § 24–106.

3. After our remand in Leach v. United States, supra, the original sentence could not stand without further proceedings. The reconsideration was therefore part of the criminal proceedings which required the defendant's presence. Cf. Williamson v. United States, 265 F.2d 236 (5th Cir. 1959), cert. denied, 358 U.S. 941, 79 S.Ct. 348, 3 L.Ed.2d 349 (1959). And see United States v. Behrens, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963).

4. "The incorporation of medical, psychiatric and. psychological services in its program of diagnosis and treatment is the greatest advance made in probation —indeed in all social work—of the last thirty years." Schute & Bell, Crime, Courts and Probation 148. Nevertheless, the United States Probation Service has not fully availed itself of psychiatric and psychological information. See Pye, Shadoan & Snee, A Preliminary Survey of the Federal Probation System, Geo.U. Law Center 24 (1963).

5. Pronounced recidivism is almost universally agreed upon as a basis for referring a prisoner for psychiatric study. See, e. g., C. E. Smith (Ass't Medical Director, Bur. of Prisons), Observation and Study of Defendants Prior to Sentencing, Fed.Prob. 6 (June 1962):
"Persons with unusual and unexplained backgrounds of recidivism, and those with a history of prior observation for mental disorder, will generally be referred for examination."
Schmidt, Criteria Governing the Selection of Offenders for Examination, Internat'l Rev. of Crim.Policy, No. 3, Jan. 1953, p. 13, at p. 15 (U.N.Doc. No. St/Soa/Ser. M/3):
"The criminal career in itself often affords a good criterion [for referring a prisoner for mental examination]. Thus, the repetition of some special category of crime, the character of the recidivism (for example, the very frequent repetition of an offence) or the reaction of the offender to previous punishment will often direct attention to the offender in a way that will reveal the need for examination."

6. If the judge thought Leach was raising an issue of incompetency or insanity, even as late as sentencing, it would have been well to order a mental examination to avoid the necessity of a later § 2255 motion. See Mock v. United States, 329 F.2d 496 (6 Cir., 1964).

█ The adamant refusal in this case to refer the prisoner for a mental examination was an abuse of discretion. Three statutes make a psychological evaluation of the prisoner available to the sentencing judge in the District of Columbia. The court may refer him to a mental hospital for examination if "it shall appear * * * from the court's own observations or from prima facie evidence * * * that the accused is of unsound mind or is mentally incompetent * * * to understand the proceedings." D.C.Code § 24–301(a). This statute may have misled the judge. He stated that there "was no evidence * * that the defendant had any mental illness," which implies that he thought the conditions set by § 24–301 are always requisite for a pre-sentence examination. But provisions other than § 24–301 allow such examinations and there are other reasons than those in § 24–301 for ordering such examinations.[7] In Leach's case extreme recidivism was combined with a request for aid, and the probation officer, who had investigated Leach's background and had talked to him at length, called him a psychopathic offender. The diagnosis of the New Jersey State Prison, part of the pre-sentence report, was: "psychopathic personality, unstable, unreliable, recidivistic, antisocial, poor prognosis for good adjustment if released." This might well be a sufficient *prima facie* case for an examination.[8] But assuming *arguendo* that it was not, it was enough to make clear the usefulness of a psychological evaluation in determining the sentence.

█ Section 24–106 (D.C.Code) provides "a qualified psychiatrist and a qualified psychologist" for the district judges and the probation officers, among others, "to assist them in carrying out their duties." The statute leaves to the judges' discretion the cases in which they should use the Legal Psychiatric Services. But we pointed out in our former opinion herein that the District Court had recently refused to employ the service at all. This seems to reflect a failure to exercise discretion. In 1960, 51 cases were referred to the service and in 1962 only 3.[9] In the absence of any indication of major change in the types of cases before the courts, or of poor performance by the service, we were at a loss to discover the reason for this sudden drop in referrals. Leach could have been examined under this statute.[10]

7. If a prisoner is found incompetent or mentally ill under § 24–301(a), he may be treated on a short-term basis or even committed until cured. Section 24–301(a) has generally been applied in but is not limited to cases in which insanity has failed as a defense or in which the defendant has pleaded guilty and his competency to undergo sentencing is at issue. See the discussion of the section by the Supreme Court in Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).

8. Few cases in this court, none recent, have dealt with the showing necessary under the statute (§ 24–301(a)) before sentencing. Apparently, defendants have not often raised the issue and this court has not often had occasion to review the discretion of the trial judge.

9. 320 F.2d at 673 n. 5.

10. The dissent argues that the legislative history of § 24–106 prevents Leach's referral under it. In making the Legal Psychiatric Services available to district judges, Congress was apparently concerned with the specific situation of the incompetent prisoner who desires to plead guilty. But the statute did not restrict the judges' use of the service to this specific situation. Rather, it made the service available to judges on the same basis as to probation officers, juvenile court officers, etc., "to assist them in carrying out their duties." The fact is that prior to 1961, and since our first opinion herein, Leach v. United States (1963), *supra*, district judges were and are using the service to aid in a variety of sentencing problems. Letter to Chief Judge Bazelon from Dr. David A. Lanham, Chief of the Legal Psychiatric Services, dated March 25, 1964. Thus nothing in the statute itself or the practice under the statute prevented the judge from referring Leach to the Legal Psychiatric Services. Of course, the abuse of discretion was not the refusal to use the Legal Psychiatric Services in particular, but the failure to order a mental examination which was available through several facilities.

Also open to the sentencing judge is the possibility of sentencing the prisoner, then referring the prisoner to the custody of the Attorney General where the Prison Bureau may make a complete survey of his mental, social and emotional adjustment in a controlled atmosphere.[11] Rule 35, FED.R.CRIM.P., provides that "the court may reduce a sentence within 60 days after [it] is imposed." Thus the judge may refer the prisoner for two months of study and if a prognosis for rehabilitation appears he may then reduce the sentence.

The widely acknowledged usefulness of this technique moved Congress in 1958 "to make the opportunity [for study]` more certain"[12] by allowing a Federal judge to refer a prisoner for a possible 6-month rather than 2-month period. 18 U.S.C. § 4208(b). The stat-

ute calls for the collection of "data regarding the prisoner's previous delinquency or criminal experience, pertinent circumstances of his social background, his capabilities, his mental and physical health, and such other factors as may be considered pertinent." 18 U.S.C. § 4208(c). Though the 6-month period is not applicable to offenses under the D.C. Code, the opportunity to reduce a sentence after evaluation is available for a 60-day period[13] under Rule 35, FED.R. CRIM.P.

■ Section 4208(b) was one of a group of statutory changes by which Congress showed profound interest in the rehabilitative function of sentencing and recognized the potential value of modern psychological knowledge in achieving the aim.[14] The legislation resulted from a movement by judges over

11. The process of study was described by James V. Bennett, Director of the Bureau of Prisons, before the Sentencing Institute in the District of Columbia on January 30, 1960:

"[T]he defendant is committed to a federal institution having the best staff and equipment to diagnose the case. A prisoner upon receipt in the institution is interviewed by all of the members of the staff, including the doctor, the case worker, the psychiatrist, and the chaplain and then his case goes before the full classification committee where it is discussed fully and a staff recommendation agreed upon. The case is then submitted to us in Washington where it is again reviewed by our staff, and a letter written to the judge outlining what seems to us to be the pertinent points to be considered, the kind of treatment that we believe would be most effective in bringing about the offender's rehabilitation and what sentence we believe would be most fitting."

12. S.Rep.No. 2013, 85th Cong., 2d Sess. p. 10; U.S.Code and Congressional News, p. 3891 (1958).

13. It was apparently felt that in the interest of simplicity the expanded period should be confined to Federal offenses. See testimony before Subcommittee No. 3 of the House Committee on the Judiciary on H.J.Res. 425, 85th Cong., 2d Sess., 36, 37 (1958).

14. Other parts of the legislation which passed at the same time (Pub.L. 85–752, Aug. 25, 1958, 72 Stat. 845) were:

28 U.S.C. § 334, which provided for institutes and joint councils on sentencing to consider among other items "(1) The development of standards for the content and utilization of presentence reports; (2) the establishment of factors to be used in selecting cases for special study and observation in prescribed diagnostic clinics; (3) the determination of the importance of psychiatric, emotional, sociological and physiological factors involved in crime and their bearing upon sentences; (4) the discussion of special sentencing problems in unusual cases such as treason, violation of public trust, subversion, or involving abnormal sex behavior, addiction to drugs or alcohol, and mental or physical handicaps; (5) the formulation of sentencing principles and criteria which will assist in promoting the equitable administration of the criminal laws of the United States."

18 U.S.C. § 4208(a), which authorized the courts in sentencing a prisoner to fix an earlier date when he may become eligible for parole or to impose the maximum sentence and leave the time of eligibility for parole within the discretion of the parole board. S.Rep. No. 2013, 85th Cong., 2d Sess. (1957). The hearings on the bill make clear its purpose to facilitate rehabilitation by assuring that parole will be possible when the prisoner has reached an appropriate stage in his rehabilitation.

the country to examine and improve sentencing techniques.[15] The traditional effort to make the punishment fit the crime is largely superseded by an effort to make the treatment fit the offender. The presentence report in which a probation officer makes a study of the social background and history of the offender has become routine. This court recently reversed a case in which a judge sentenced two youthful offenders immediately after trial without awaiting a pre-sentence report. Peters v. United States, 113 U.S. App.D.C. 236, 307 F.2d 193 (1962). Psychiatric evaluation through the Legal Psychiatric Services or through the Prison Bureau program, like the presentence report, is a useful tool for rehabilitative rather than retributive sentencing. Such evaluation does not, of course, provide all the answers to the sentencing puzzle, but Congress and experts in criminology agree that it has a crucial place in the process.

This plainly appears from House and Senate reports on § 4208(b):

"The Federal judge has a heavy caseload, and the time and resources available to him in the determination of sentences are extremely limited. He frequently does not get sufficient information from the prosecuting attorney, the defense attorney, the probation officer's presentence report, or the defendant himself to enable the court to formulate a sentence which is equitable both to the defendant and to the public. H.Rep. No. 1946, 85th Cong., 2d Sess. 6 (1958).

"This observation and diagnosis would be extremely helpful to the court in making disposition in certain types of cases; particularly where a difficult medical, psychiatric, sex, or rehabilitative problem may be involved." S.Rep. No. 2013, 85th Cong., 2d Sess. 10, U.S.Code Congressional and Administrative News, p. 3898 (1958).

Since these considerations apply to Leach's case, we must respectfully reject the dissent's contention at pp. 954, 955 that the concerns of § 4208(b) are somehow inapplicable.

■ A judge sentencing for a D.C. Code violation has two sources other than D.C.CODE § 24–301(a), supra p. 948, from which to obtain a psychiatric evaluation: The Legal Psychiatric Services, D.C.CODE § 24–106, and the two-month study made possible by Rule 35, Fed.R. CRIM.P. But the first has fallen into desuetude and the judges have ignored the second even after its endorsement by Congress in 18 U.S.C. § 4208(b). Against this background of neglect, Leach's case is a dramatic example of the need for such services. If Leach, his family or friends had had the intellectual and financial ability, he would have been able to present psychiatric and other information directed to the separate issue of sentencing. Compare the extensive psychiatric evidence and argument offered to mitigate the sentence by the wealthy defendants in the Loeb-Leopold case. Sellers, THE LOEB-LEOPOLD CASE. A wide difference between the opportunities for justice available to the rich and poor has often been held "invidious discrimination." Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Greenwell v. United.

15. The last five years have swelled the sentencing literature, with the emphasis always on the need to study the individual offender and mete justice for him. See Bennett, *Count-Down for Judicial Sentencing*, 28 J. BAR ASS'N, D.C. 420 (1961); Glueck, *Pre-sentence Examination of Offenders To Aid in Choosing a Method of Treatment*, 41 J.CRIM.L. & CRIMINOLOGY 717 (1951); Kaufman, *Enlightened Sentences Through Improved Techniques*, FED.PROB. 3 (Sept. 1962); *Pilot Institutes on Sentencing under the Auspices of the Judicial Conference of the United States*, July 16–17, 1959, 26 F.R.D. 231 (1961); Special Issue on the Medico-Psychological and Social Examination of Offenders, INTERNAT'L REV. OF CRIM.POLICY, No. 3, Jan. 1953 (U.N.Doc. No. ST/SOA/Ser. M/3); see generally, excellent bibliography in the Report to the House Committee on the Judiciary, Federal Sentencing Procedures, 85th Cong., 2d Sess. 162–65 (1958).

States, 115 U.S.App.D.C. 44, 317 F.2d 108 (1963); Brown v. United States, 118 U.S.App.D.C. ——, 331 F.2d 822 (decided April 10, 1964).

In Jones v. United States, No. 17485, decided *en banc* Dec. 13, 1963, 117 U.S. App.D.C. 169, 327 F.2d 867, we reversed a death sentence because the trial judge had not received and considered the results of a mental examination before exercising his statutory discretion to reimpose a capital sentence. *Cf.* Watson v. Cameron, 114 U.S.App.D.C. 151, 312 F.2d 878 (1962).[16]

We do not question the general rule that an appellate court will not ordinarily review sentences that are within the statutory maximum. We hold only that the sentencing judge should use some of the resources which Congress has provided and that he may not arbitrarily ignore the data properly obtained thereby. See United States v. Wiley, 267 F.2d 453 (7th Cir. 1959); United States v. Wiley, 278 F.2d 500 (7th Cir. 1960), in which the appellate court first remanded because of the trial judge's refusal to hold a probation hearing, and, on the second appeal, after a hearing had been accorded and probation denied, set aside the sentence as too severe. See also United States v. Frank, 245 F.2d 284, 288 (3d Cir.), *cert. denied,* 355 U.S. 819, 78 S.Ct. 25, 2 L.Ed.2d 35 (1957); United States v. Cosentino, 191 F.2d 574, 575 (7th Cir. 1951).

The sentence will be set aside and the case remanded with directions to grant the defendant's request for a mental examination before re-sentencing, and to conduct any further proceedings in accordance with this opinion.

So ordered.

---

[16]. In *Watson* the court confronted a statute leaving the broadest discretion in the trial judges. D.C.CODE § 24–301 (1961). But this court in order to serve "the ends of justice and its efficient administration" established a minimum standard for the statute's application. Here, in pursuit of the same ends, we hold that though the trial judge has broad discretion in sentencing, he may not ignore the facilities which Congress has

BASTIAN, Circuit Judge (dissenting).

On April 25, 1963, this court affirmed the conviction of Leach for robbery, D.C. Code § 22–2901, but remanded the case for reconsideration of the sentence, observing that there was no indication that the District Court had "made use of any of the aids to sentencing placed at its disposal by the Congress." Leach v. United States, 115 U.S.App.D.C. 351, 320 F.2d 670 (1963). I agreed to affirmance of the conviction but dissented to the remand, stating that this court has no jurisdiction over sentencing and that it certainly has no authority to direct the District Court to exercise in a specific manner a power which, by its very terms, is purely discretionary.

On remand, the case was reconsidered by Judge Curran, who had originally sentenced the appellant. In a well reasoned and convincing opinion,[1] Judge Curran permitted the original sentence to remain undisturbed. Leach has appealed from this action and has filed in this court a "Motion for Summary Reversal." This court, purporting to find an abuse of discretion on the part of the District Court, now vacates that sentence.

Inasmuch as the majority opinion is so broad and, to my mind, so legally incorrect, I feel some comment on the views expressed therein is necessary. I shall deal with each of the statutes stated by my colleagues to be authority for the granting of a psychiatric evaluation, the non-use of which they hold to be an abuse of discretion by the trial judge.[2] D.C.CODE § 24–301.

In pertinent part this section reads:

"(a) Whenever a person is arrested, indicted, [or] charged by infor-

---

made available in a case where the need for their use is clear.

1. United States v. Leach, 218 F.Supp. 271 (D.D.C.1963).

2. The majority's dictum that Leach was entitled to be present with counsel at the time of the reconsideration of the sentence, following the remand, is untenable. Cf. Corey v. United States, 375 U.S. 169, 84 S.Ct. 298, 11 L.Ed.2d 229 (1963) and

mation \* \* \* for or with an offense and, prior to the imposition of sentence \* \* \* it shall appear to the court from the court's own observations, or from prima facie evidence submitted to the court, that the accused is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense, the court may order the accused committed to the District of Columbia General Hospital or other mental hospital designated by the court, for such reasonable period as the court may determine for examination and observation \* \* \*."

The District Judge held, in effect, that it did not appear to him from his own observation, nor was there a *prima facie* showing, that appellant was of unsound mind or that he was "mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense," and the record sustains that view. Certainly the comment of the probation officer in the

pre-sentence report was not sufficient evidence. His opinion was not that of an expert, and it is settled that opinion evidence by a lay witness is insufficient to establish *prima facie* that a defendant is mentally incompetent so as to require commitment for examination.[3] The fact that the probation officer himself did not recommend that Leach be referred for examination indicated his actual belief that appellant was not mentally incompetent. Also, the reports of the New Jersey State Prison, compiled nine and twelve years prior to appellant's trial here, would be of little or no value for the purpose of establishing a *prima facie* showing of his mental condition at this time.[4] In the final analysis, and as stated by counsel for appellant at the time of sentencing, there was no *prima facie* showing and "the only thing there was, was recidivism." According to prior holdings of this court, recidivism alone is insufficient to require the granting of a mental examination.[5]

On the basis of this statute, therefore, there can be no justifiable finding of improper exercise of discretion by the trial

---

its companion case, United States v. Behrens, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed. 2d 224 (1963); United States v. Rosanc, 326 F.2d 487 (3rd Cir. 1964).

This court's first opinion stated: "[The case] should be remanded to the District Court for *reconsideration of the sentence.* It may be that on reconsideration *the sentence previously imposed will be undisturbed.*" 320 F.2d at 673. [Emphasis supplied.] On remand, Judge Curran stated: "This court has *carefully reconsidered the sentence imposed,* as suggested by the appellate court. \* \* \* [T]he sentence heretofore imposed by this court *will not be disturbed.*" 218 F.Supp. at 274. [Emphasis supplied.] It is manifest, therefore, that the status of the case on remand was one of an existing sentence subject to modification; the original sentence had not been vacated, and the District Judge's decision can in no way be construed as an imposition of a new sentence.

Both White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), and Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) (on which the *White* case was premised), dealt only with an accused's right to

counsel during pre-trial criminal procedures. The concern of those cases was the protection of the rights of an accused in a capital case, the court fearing that without "counsel at every step in the proceedings against [the accused] \* \* \* he faces the *danger of conviction* because he does not know how to *establish his innocence.*" [Emphasis supplied.] 368 U.S. at 54, 82 S.Ct. at 159, 7 L.Ed. 2d 114, quoting Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Those cases do not apply where, as here, the accused has already been convicted and, moreover, was present with counsel at the time of original sentencing. It cannot seriously be contended that one properly convicted of a crime has a right to a sentence other than the one imposed (assuming, of course, that the sentence imposed is within the limits allowable by statute).

3. Neely v. United States, 80 U.S.App.D.C. 187, 150 F.2d 977, *cert. denied,* 326 U.S. 768, 66 S.Ct. 166, 90 L.Ed. 463 (1945).

4. *Ibid.*

5. Williams v. United States, 114 U.S.App. D.C. 135, 312 F.2d 862 (1962). Compare Blocker v. United States, 110 U.S.

judge,[6] and consequently there are no grounds for vacating the sentence imposed.

FED.R.CRIM.P. 35.

Rule 35 provides:

"The court may correct an illegal sentence at any time. The court may reduce a sentence within 60 days after the sentence is imposed, or within 60 days after receipt by the court of mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 60 days after receipt of an order of the Supreme Court denying an application for a writ of certiorari."

It is well established that the narrow function of Rule 35 is, as its wording makes clear, to permit *correction* of an *illegal* sentence, not to provide re-examination of other proceedings prior to imposition of sentence.[7] In fact, Rule 35 presupposes a valid conviction and affords the procedure for bringing an improper sentence (e. g., one in excess of the statutory maximum) into conformity with the law.[8] In addition, the rule vests the trial court with broad discretionary powers to reduce a sentence within 60 days of its imposition.[9] Inasmuch as the discretion of a judge in imposing sentence is virtually unassailable so long as the sentence is within the statutory limits,[10] the discretion involved in the use or non-use of the power to reduce such a sentence is *at least* equally removed

App.D.C. 41, 288 F.2d 853 (1961). See also A.L.I. Model Penal Code § 4.01 (2) (Proposed Official Draft, May 4, 1962, adopted at the 39th Annual Meeting of the American Law Institute, May, 1962).

In its opinion, the majority states:

"The judge gave four reasons for adhering to the former sentence: the probation officer had recommended the maximum sentence and had not himself * * * referred Leach for a mental examination; the crime was a serious one; the defendant had a record of repeated robberies; and 'there was no competent evidence of any kind prior to, during or after the trial or prior to the imposition of sentence, that the defendant Leach was suffering from any mental illness.'

"We think these reasons do not support the judge's decision."

In other words, the majority is saying that a District Judge is not justified in denying a request for a mental examination where (1) the prisoner is a recidivist convicted of a serious crime, (2) the probation officer recommends a maximum sentence without referring him for a mental examination, and (3) the record is devoid of evidence of mental illness. The statement of the majority is incorrect.

6. Cf. Wheeler v. United States, 82 U.S. App.D.C. 363, 366, 165 F.2d 225, 228 (1947), *cert. denied* 333 U.S. 829, 68 S. Ct. 448, 92 L.Ed. 1115 (1948). Accord, United States v. Burdette, 161 F.Supp. 326 (E.D.Mich.1957), *aff'd* 254 F.2d 610 (6th Cir. 1958); McIntosh v. Pescor, 175 F.2d 95 (6th Cir. 1949). Illustrating the broad discretion vested in the trial court

under statutes *specifically* providing for pre-sentence mental examinations, see United States ex rel. Elliott v. Hendricks, 213 F.2d 922, 931–932 (3d Cir.), *cert. denied* 348 U.S. 851, 75 S.Ct. 77, 99 L.Ed. 670 (1954); Commonwealth v. Patskin, 375 Pa. 368, 100 A.2d 472 (1953).

7. Hill v. United States, 368 U.S. 424, 430, 82 S.Ct. 468, 7 L.Ed.2d 417, *rehearing denied*, 369 U.S. 808, 82 S.Ct. 640, 7 L.Ed. 2d 556 (1962); Redfield v. United States, 315 F.2d 76 (9th Cir. 1963); United States v. Crosby, 314 F.2d 654 (2d Cir. 1963); Simmons v. United States, 302 F. 2d 71 (3d Cir. 1962); Green v. United States, 274 F.2d 59 (1st Cir. 1960).

Rule 35 was a codification of existing law and was intended to remove any doubt created by the ruling in United States v. Mayer, 235 U.S. 55, 67, 35 S.Ct. 16, 59 L. Ed. 129 (1914), about the jurisdiction of a district court to correct an illegal sentence after the expiration of the term at which it was entered. Heflin v. United States, 358 U.S. 415, 422, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959) (concurring opinion).

8. United States v. Morgan, 346 U.S. 502, 506, 74 S.Ct. 247, 98 L.Ed. 248 (1954); Cook v. United States, 171 F.2d 567, 570 (1st Cir. 1948). Cf. Holiday v. Johnston, 313 U.S. 342, 349, 61 S.Ct. 1015, 85 L.Ed. 1392 (1940); Lockhart v. United States, 136 F.2d 122, 124 (6th Cir. 1943).

9. See Yates v. United States, 355 U.S. 66, 72, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957).

10. See Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (quoted *infra* note 25); Boerngen v. United States, 326 F.2d 326, 329

from appellate interference, if not more so.

The majority, however, point out that the period provided by Rule 35 may be used for psychiatric study of the prisoner for the purpose of a more informed resentencing, and hold that the non-use of this novel "technique" contributes to an abuse of discretion on the part of the sentencing judge.

In attempting to justify its position, the majority construes 18 U.S.C. 4208(b) [11] to be an "endorsement by Congress" of a procedure for the referral of a prisoner for pre-sentence mental examination under Rule 35, and suggests that the force of this "endorsement" *required* the sentencing judge to follow this method here. Putting aside the matter of the trial judge's discretion in using Rule 35, which I feel precludes the majority's holding on this point, the position of the majority is otherwise wholly untenable.

First, as noted in our earlier opinion, *18 U.S.C. § 4208 does not apply to persons charged with or convicted of offenses under the District of Columbia Code.*[12] It follows that, Leach having been convicted under D.C.Code § 22–2901, § 4208 has no application here.

Second, the analogy between § 4208 and Rule 35, the asserted force of which is said to incorporate the statutory procedures into the discretionary 60-day provision of the Rule, is tortured at best. Both the wording and the legislative history of the entire section 4208 indicate that its primary concern is with the *disparity* in the *length of sentences,* and was clearly intended to encourage uniformity in the determination of parole eligibility dates at the time of sentencing.[13] Under subsection (a), the trial court, in its discretion, may designate a minimum period, not to exceed the maximum sentence, at the end of which

(5th Cir. 1964) ; cases cited *infra* note 22.

11. 72 Stat. 845 (1958).

12. 320 F.2d at 672, n. 4; Public Law No. 86–624, § 13(c), July 12, 1960, 74 Stat. 413.

13. H.R. Rep. No. 1946, 85th Cong., 2d Sess. 9 (1958):
"Section 3 of the bill would provide the judge with alternative procedures in sentencing convicted offenders to imprisonment. The judge could sentence as at present, by fixing the maximum term and leaving parole eligibility at one-third of this maximum. Or he could set any maximum term up to the statutory limit and at the same time specify a parole eligibility date falling at any time up to one-third of the court-imposed maximum. Thirdly, he could set only the maximum term and specify that the parole eligibility date would be determined by the Board of Parole.
"This procedure in the case of a serious chronic offender would permit the judge to set both the maximum term and the parole eligibility date at the statutory limits. * * *"
S.Rep. No. 2013, 85th Cong., 2d Sess. 4–5, U.S.Code Congressional and Administrative News, p. 3983 (1958) :
"The proposed amendment, together the committee that an examination of case histories and court statistics indicate that widespread disparities charac-

terize the sentences now imposed by Federal judges. * * * The Bureau of Prisons has pointed out that such disparities conflict with the public interest. They result in sentences which may be too long or too short for their purposes. Prisoners must often be released at the end of relatively short terms when it is apparent that they still represent a distinct threat to the public safety. Other prisoners must be retained in prison long after they could be safely released and in these cases such prolonged imprisonment often produces hardened and embittered attitudes by the time mandatory release dates are reached. The existence of wide disparities casts doubt upon the evenhandedness of justice and discourages a respect for the law. * * *"
H.R. Rep. No. 2579, 85th Cong., 2d Sess. (1958) Conference Report 2–3:
"The purpose of the principal Senate amendment (sec. 3) is to provide the court with optional procedures which will enable it to impose sentences indeterminate in nature. This will permit the court, at its discretion, to share with the executive branch responsibility for determining how long a period a prisoner should actually serve. * * *
*    *    *    *    *
"The proposed amendment, together with the other provisions of House Joint Resolution 424, represent the product of many years of study by judicial law, and administrative groups and by other per–

the prisoner will be *eligible for parole.* In the alternative, the court, again in its discretion, may impose the maximum term and specify that the prisoner's eligibility for parole will be determined by the parole board.

Subsection (c) provides that if the prisoner is sentenced in either of the two ways provided in subsection (a), the Director of the Bureau of Prisons will conduct a complete study of the prisoner and furnish the *parole board* with a summary of the findings. In the words of the court in Van De Bogart v. United States, 305 F.2d 583, 585 (5th Cir. 1962):

"[T]he purpose of such study [under § 4208(c)] is *specifically confined to 'determining the suitability of the prisoner for parole.'*" [Emphasis supplied.]

Under these provisions, therefore, jurisdiction in determining parole dates is vested in the parole board, sentence having already been pronounced.[14] Consequently, no "endorsement" of *any* type of court-ordered pre-sentence mental examination can be derived from this part of the statute.

Subsection (b) provides:

"If the court desires more detailed information as a basis for determining the sentence to be imposed, the court *may* commit the defendant to the custody of the Attorney General, which commitment shall be deemed to be for the maximum sentence of imprisonment prescribed by law \* \* \*." [Emphasis supplied.]

Under this subsection the court is to be furnished, within three months, a complete report on the prisoner by the Director of the Bureau of Prisons, at which time the court may, in its discretion

"(1) Place the prisoner on probation as authorized by section 3651 of this title, or (2) affirm the sentence of imprisonment originally imposed, or reduce the sentence of imprisonment, and commit the offender under any applicable provision of law. \* \* \*"

On its face, as well as by virtue of its legislative history, this subsection also is primarily concerned with the *length* of sentences and the determination of *parole eligibility.* While there is no indication in the congressional consideration of the measures, nor any decided cases discussing the point, some writers and individual judges have felt that under § 4208 (b), prisoners may also be referred for study in order to determine whether psychiatric hospitalization rather than imprisonment is indicated.[15] The majority here, however, state that by virtue of the authority of a sentencing judge to refer for pre-sentence psychiatric evaluation under § 4208(b), Rule 35 also permits (in fact, *requires*) the same procedures. To my mind, the inference is a *non sequitur.* Perhaps the only characteristic common to both Rule 35 and § 4208(b) is their discretionary nature. Clearly suggesting some of the many distinctions between § 4208(b) and Rule 35

---

sons associated with the administration of criminal justice and of the problem of sentence disparities. \* \* \*
\* \* \* \* \*
"It should be emphasized that the provisions of the proposed legislation, including the Senate amendments, do not embody a softening of criminal penalties. Testimony submitted at the hearing on this legislation disclosed that terms served under indeterminate sentences average longer than do terms under the fixed system."
See also Federal Sentencing Procedures, Report to the House Committee on the

Judiciary, 85th Cong., 2d Sess. 16–25, 92–94, 96–99, 104–114 (Committee Print 1958).

14. Cf. Rivera v. United States, 318 F.2d 606 (9th Cir. 1963).

15. See, for example, the reports and discussions of the Seminar and Institute on Disparity of Sentences for the Sixth, Seventh and Eighth Judicial Circuits, held on October 12 and 13, 1961, under the auspices of the Judicial Conference of the United States, 30 F.R.D. 401, esp. pp. 434–442.

is the language of the Supreme Court in United States v. Behrens, *supra* note 2, at p. 165 of 375 U.S., at 296 of 84 S.Ct., 11 L.Ed.2d 224:

> "The whole point of using § 4208(b) is, in its own language, to get 'more detailed information as a basis for determining the sentence *to be imposed* \* \* \*.' (Emphasis supplied.) It is only after the Director of the Bureau of Prisons makes his report that the court makes its final decision as to what the sentence will be. Rule 43 of the Federal Rules of Criminal Procedure specifically requires that the defendant be present 'at every stage of the trial including \* \* \* the imposition of sentence \* \* \*.' It is true that the same rule provides that a defendant's presence is not required when his sentence is reduced under Rule 35. *But a reduction of sentence under Rule 35 is quite different from the final determination under § 4208(b) of what a sentence is to be.* Rule 35 refers to the power of a court to reduce a sentence which has already become final in every respect. There is no such finality of sentence at a § 4208(b) preliminary commitment. The use of § 4208(b) *postpones* action as to the final sentence; by using that section the court decides to await studies and reports of a defendant's background, mental and physical health, etc., to assist the judge in making up his mind as to what the final sentence shall be. It is only then that the judge's final words are spoken and the defendant's punishment is fixed. It is then that the right of the defendant to be afforded an opportunity to make a statement to the judge in his own behalf is of most importance. \* \* \* " [16] [Emphasis supplied.]

I cannot agree that § 4208(b) and Rule 35 are related in such a fashion that the procedures of one are attributable to the other, nor that such an inference, even if *logically* proper, could provide a basis for a finding of abuse of discretion in this case.

### D.C.CODE § 24–106

This statute provides in part for "a qualified psychiatrist and a qualified psychologist whose services shall be available to \* \* \* (1) In criminal cases, the judges of the district court \* \* \*."

The majority correctly observes that the statute leaves to the discretion of the trial judge when such services shall be employed. However, the majority position that the trial judge's non-use of this "available service" in this case constituted an abuse of discretion is unwarranted, unprecedented, and contrary to the wording and intent of the statute itself.

Title 24–106 was originally enacted by Congress in 1953 [17] as part of an omnibus crime bill for the District of Columbia. As initially enacted, the section established and made available psychiatric and psychological services to "(1) the probation officers of the district court and the municipal court \* \* \*." In 1954 the section was amended [18] to make the services (originally intended only for the assistance of probation officers, the Department of Corrections and the Board of Parole) available to District Court judges [19] *in those few cases where a defendant desires to enter a pretrial plea of guilty and the judge entertains some doubt that the defendant is mentally competent to do so. That the*

16. Suggesting further differences between 18 U.S.C. § 4208(b) and Rule 35 is the Court's decision in Corey v. United States, *supra* note 2.

17. Act of June 29, 1953, 67 Stat. 105, ch. 159, § 405.

18. Act of August 16, 1954, 68 Stat. 730, ch. 737, § 1.

19. The 1954 amendment was passed in response to a request by a committee comprised of District Court judges and other responsible officials, including the United States Attorney for the District of Columbia.

amendment was enacted for this restricted purpose is unquestionable.[20] Ironically, the greatest hesitation on the part of Congress in the passage of this amendment was its concern that the psychiatric personnel would be called upon too much by trial judges and that, as a consequence, the services provided for by the 1953 Act would be unduly diverted from the Parole Board and others for whom it was originally intended. In the words of the Senate Report:

"The committee has been assured that the district court judges would use the medical personnel as authorized by the bill in only a limited number of cases, such as cases where, before accepting a plea of guilty, the judge feels in fairness to the accused he should be advised as to the mental capacity of the accused.

"Unless the services of the psychiatrist and the psychologist authorized by section 405 are sparingly used by the district court judges, the primary purpose for which the section was enacted will have been defeated. * * *" S.Rep. No. 1779, 83d Cong., 2d Sess. (1954).

And the House Report states:

"Several of the members of the committee felt that, if the bill were amended to include the language proposed by the United States attorney, there might be some abuses. The judiciary of the District of Columbia assured the members of this committee that the provisions of this bill would be administered with extreme caution. This assurance was made to the members of the House District Committee by the chairman of the subcommittee which handled

20. H.R. Rep. No. 1816, 83d Cong., 2d Sess. (1954):

"The Committee on the District of Columbia, to whom was referred the bill (H.R.9077) to amend section 405 of the District of Columbia Law Enforcement Act of 1953, to make available to the judges of such District the psychiatric and psychological services provided for in such section, having considered the same, report favorably thereon without amendment and recommend that the bill H. R. 9077 do pass.

"The purpose of this legislation was set forth in a statement by Hon. Leo A. Rover, the United States attorney for the District of Columbia, at a hearing before the Crime Subcommittee, of this committee, on June 2, 1954, which is herewith made a part of this report.

"Section 405 provides that the Commissioners shall appoint a psychiatrist and a psychologist whose services would be available, among other people, to the probation officers of the District of Columbia courts and the municipal court, and to certain other District agents like the Parole Board.

"A committee was set up headed by Judge Youngdahl of the district court; 1 or 2 of the other judges were on it and some of our citizens and they came to the conclusion that *it would be very, very helpful in a certain number of limited cases,* if, instead of judges having to wait until a case got to the probation officer, which would mean a plea of guilty or conviction, that *if the judge himself, in a case where a man appeared before him and by his action it seemed to indicate that possibly he was not exactly normal, he wanted to enter a plea of guilty* and rather than having to go through a rather elaborate procedure of having a couple of psychiatrists appointed by order of the court, in that type of case, the judge himself would call on the psychiatrist or psychologist provided for under this act to help out, in rather a fairly simple examination of the man; *then the judge could tell very quickly whether or not the man was sufficiently normal to enter a plea of guilty.*

"*That is the only purpose of the amendment.* We feel that it will not be abused. We know that the Parole Board needs the services of these people pretty badly, and it is only to fill in just a little gap which the judges felt—and I happen to be on that committee—that if the Congress would be good enough to amend this by simply saying that the services would be available to the judges of the district court, and the probation officer of the District, and the municipal court, that it would give us a little step forward." [Emphasis supplied.]

the bill, in which he read the contents of a letter addressed to him by a member of the United States District Court for the District of Columbia." H.R.Rep. No. 1816, 83d Cong., 2d Sess. (1954).

Contrary to the congressional intent, and in complete disregard of the assurances of the District Court and others to Congress, this court now implies that § 24–106 *compels* a judge, on the request of a convicted defendant, to refer him for a mental examination prior to sentencing. In effect, this court is directing the District Court to act in a manner certain to divert the efforts of the Legal Psychiatric Service from its proper function. Not only has Congress not left the purposes for which the Service personnel are available to the District Court open to speculation, it has indicated an intent flatly contrary to the overreaching view of the majority.

It seems clear, therefore, that the "sources * * * from which to obtain [a psychiatric] evaluation" stated to be available to "a judge sentencing for a D.C.Code violation" are actually not appropriate for the mental examination which the majority feels should have been granted this appellant. As we have seen, Rule 35 is inapplicable since it is acknowledged that the sentence was not illegal, and the trial judge's discretion to reduce the sentence was not exercised. Furthermore, the unambiguous purpose of the enactment of D.C.Code § 24–106 renders that statute inappropriate.

In view of the fact, tacitly admitted by the majority opinion, that no *prima facie* showing under § 24–301 was made, there seems to be no justification for the holding here other than a desire to review the sentence imposed in the District Court.[21] Ignored is the 73-year history of undeviating federal precedents holding that an appellate court has no power to modify a sentence.[22] In view of the actual result in this case, the statement "We do not question the general rule that

21. Jones v. United States, 117 U.S.App. D.C. 169, 327 F.2d 867 (1963), cited by the majority, is inapplicable here. In that case, the narrow issue presented was the effect of intervening congressional legislation on a prior mandatory death sentence imposed under D.C.Code § 22–2404. We observed that the reimposition of the death sentence "came without consideration of the pending motion for a mental examination. That motion, on file since October 2, 1962, had asked 'for a complete mental examination at this time.' It was supported by the unrefuted affidavit of the appellant's sister. It is our conclusion since life was at stake, the judge on October 19, 1962 should not have acted upon the motion for reduction of sentence without consideration of adequate information as to the appellant's mental condition or possible lack of mental competency *as of that date*." 327 F.2d at 872–873.

There is no death sentence involved in the present case, nor is there any statute intervening since the time of sentencing indicating a change in the statute under which the sentence was imposed. Moreover, and perhaps more critical, petitioner's motion for mental examination (unsupported by any affidavit) was filed on June 11, 1963, and was not a "pending motion" on May 14, 1963, when the trial judge determined that the original sentence would not be disturbed.

22. "If there is one rule in the federal criminal practice which is firmly established, it is that the appellate court has no control over a sentence which is within the limits allowed by a statute." Gurera v. United States, 40 F.2d 338, 340–341 (8th Cir. 1930). See also, *e. g.*, United States v. Baysden, 326 F.2d 629 (4th Cir. 1964); Epperson v. Anderson, 117 U.S.App.D.C. 122, 326 F.2d 665 (1963); Ellis v. United States, 321 F.2d 931, 933 (9th Cir. 1963); Rogers v. United States, 304 F.2d 520 (5th Cir. 1962); United States v. Sohnen, 280 F.2d 109 (2d Cir. 1960); Roth v. United States, 255 F.2d 440 (2d Cir.), *cert. denied*, 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed. 2d 61 (1958); Flores v. United States, 238 F.2d 758 (9th Cir. 1956); Brown v. United States, 222 F.2d 293 (9th Cir. 1955); United States v. Rosenberg, 195 F.2d 583, 604 (2d Cir.), *cert. denied*, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, 344 U.S. 850, 73 S.Ct. 66, 97 L.Ed. 661, 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 652 (1952); Berg v. United States, 176 F.2d 122 (9th Cir.), *cert. denied*, 338 U.S. 876, 70 S.Ct. 137, 94 L.Ed. 537 (1949); United States v. Ward, 173 F.2d 628 (2d

an appellate court will not ordinarily review sentences that are within the statutory maximum" has little redemptive value.

I agree with my colleagues that the sentencing of criminals should not be predicated on a wholly retributive concept, but I also think that it should not be limited to purely rehabilitative ends.[23] Additional considerations, including reformation, deterrence, and the protection of the public, are factors which must also be regarded.[24] All of these, however, are considerations which the *trial judge*

must weigh and decide, and our capacity as an appellate court does not permit the substitution of our judgment for that of the trial court.[25] Congress has not given us the power to review sentences,[26] and I do not think we should have that power. The sentencing judge, who has heard the details of the crime, has observed the defendant at close range, and who is not dependent on a mere printed record, is in a better position to judge the matter of sentence than is an appellate court. It should be remembered also that the Dis-

Cir. 1949); Beckett v. United States, 84 F.2d 731 (6th Cir. 1936); Scala v. United States, 54 F.2d 608 (7th Cir. 1931); Smith v. United States, 3 F.2d 1021 (9th Cir. 1925); Carpenter v. United States, 280 F. 598 (4th Cir. 1922); Wallace v. United States, 243 F. 300 (7th Cir. 1917).

23. "A penal code that reflected only a single basic principle would be a very bad one. Social purposes can never be single or simple, or held unqualifiedly to the exclusion of all other social purposes; and an effort to make them so can result only in the sacrifice of other values which are also important. * * *

"The problem, accordingly, is one of the priority and relationship of purposes as well as to their legitimacy—of multivalued rather than single-valued thinking."

Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Prob. 401 (1958).

24. See, *e. g.*, the remarks of Judge Kaufman, at the Judicial Conference of the United States Court of Appeals for the Second Circuit, September 24, 1962, 32 F.R.D. 249, 258–259:

" * * * the sentencing decision seeks to accomplish one or more of the objectives of criminal sanctions: *'rehabilitation* of the convicted offender into a non-criminal member of society; *isolation* of the offender from society to prevent criminal conduct during the period of confinement; *deterrence* of other members of the community who might have tendencies toward criminal conduct similar to those of the offender (secondary deterrence), and deterrence of the offender himself after release; *community condemnation* or the reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves; and *retribution* or the satisfaction of the community's emotional desire to punish the offender.' "

Also, Williams v. New York, 337 U.S. 241, 248, n. 13, 69 S.Ct. 1079, 93 L.Ed. 1337 (1948).

25. In Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 182,. 76 L. Ed. 306 (1932), the Supreme Court observed: "Under the circumstances, so far as disclosed, it is true that the imposition of the full penalty of fine and imprisonment upon each count seems unduly severe; but there may have been other facts and circumstances before the trial court properly influencing the extent of the punishment. In any event, the matter was one for that court, with whose judgment there is no warrant for interference on our part."

That the majority feel "Leach's case is a dramatic example of the need for such [psychiatric] services" would indicate only a personal disagreement with the District Judge's views, hardly an appropriate basis for vacating the sentence, and clearly not a ground for predicating an abuse of discretion on the part of the sentencing judge.

26. In Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405 (1958), the Supreme Court said:

"In effect, we are asked to enter the domain of penology, and more particularly that tantalizing aspect of it, the proper apportionment of punishment. Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility, * * * these are peculiarly questions of legislative policy. Equally so are the much mooted problems relating to the power of the judiciary to review sentences. First the English and then the Scottish Courts of Criminal Appeal were given power to revise sentences, the power to increase as well as the power to reduce them. * * * *This Court has no such power*." [Emphasis supplied.]

trict Judge here had the benefit of the probation officer's pre-sentence report.[27]

I think the District Judge in this case fulfilled his duties, and I am afraid that the present disposition is an example of appellate judges applying their own ideas of what the law ought to be, and not what the law is.

I dissent.

### APPENDIX TO DISSENT

The original majority opinion in this case contained no reference whatever to "invidious discrimination." In addition, page 10 of the original slip opinion has been amended to make reference, among other things, to Leach's "financial ability" and to the Loeb-Leopold case.[28] This post-decision inclusion by the majority is so completely extraneous as to require no answer. Since, following this court's earlier remand, the original sentence was left undisturbed and no hearing was had, the matter of Leach's financial ability to offer "psychiatric or other information" never presented itself.

Further than this, it is particularly unfortunate, in my opinion, to indicate by the language used that Leach suffered because of his "financial ability." Such is not the case. He had the benefit, in his trial and on his two appeals here, of able counsel, who diligently protected his interests; and certainly Clarence Darrow (who kept the defendants in the Loeb-Leopold case from the electric chair) could have done no more than did counsel in this case for Leach—all without compensation, and in the best traditions of our bar. In this connec-

tion, let me add that the bar of this court and of the District Court has always responded, at great sacrifice on their part and with great ability, to the many thousands of requests by the courts to represent indigent defendants.

27. Moreover, the District Judge's sentence here in no way precludes the mental examination and, if necessary, the psychiatric treatment of the prisoner. As I pointed out in my earlier dissent: "under the federal prison system a prisoner, upon his arrival at prison, is first processed for weeks in order to classify him and determine what rehabilitation is called for and, specifically, whether mental treatment is needed. If the psychia-

trists conclude the prisoner needs their help, he is sent to the institution at Springfield, where the warden (Dr. Settle) is himself a psychiatrist." 115 U.S. App.D.C. 351, 355, 320 F.2d 670, 674 (1963).

28. The amended material to which reference here is made is contained on page 950 of this report.