Grover Lee ISAAC, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15081.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 18, 1959.

Decided Jan. 21, 1960.

Mr. Myron G. Ehrlich, Washington, D. C. (appointed by this court), for appellant.

Mr. Carl W. Belcher, Asst. U. S. Atty., with whom Mr. Oliver Gasch, U. S. Atty., was on the brief, for appellee.

Before PRETTYMAN, Chief Judge, and BAZELON and BURGER, Circuit Judges.

PRETTYMAN, Chief Judge.

Appellant Isaac was indicted, tried by a jury, and convicted of first-degree murder, assault with a dangerous weapon, and assault with intent to kill. It was an extraordinarily atrocious

crime. He had been associating intimately for some years with a woman to whom he was not ceremonially married. She had two small sons, aged four and six, not his children. Isaac and the woman quarreled. He took the two boys to his room and cut their throats, killing one and maiming the other. No serious question was presented as to the fact that Isaac did the alleged act. The defense was insanity.

The judgment must be set aside. It is clear beyond question that at the close of all the evidence a reasonable mind must necessarily have had a reasonable doubt as to the sanity of the accused, and the trial judge should therefore at the conclusion of the case have directed a judgment of acquittal by reason of insanity.[1]

Upon the trial the prosecution established the facts of the crime and presented no evidence as to the mental condition of the accused, relying at that point, properly, upon the presumption of sanity. The defense then presented the testimony of three psychiatrists and a clinical psychologist. The offense had occurred November 17, 1955. In January, 1956, Isaac had been sent to St. Elizabeths Hospital for observation and on June 1, 1956, had been certified by the court, pursuant to the doctors' report, as incompetent to stand trial—unable to understand the charges or to assist in his defense. In 1959 he was certified as competent to stand trial and went to trial on February 25th of that year. The expert witnesses were all on the staff at the Hospital and had examined and observed him during his stay there. One first examined him on February 27, 1956, another "in 1956", and the other observed him "over a two and a half year period." The psychologist testified she had supervised a psychological test given to the defendant in September, 1956, after two unsuccessful attempts to administer tests in March and May of that year. The first doctor witness testified that he had examined Isaac "a considerable number of times", had made a case study, and had interviewed relatives. He testified Isaac was suffering from a psychoneurotic reaction, a disassociative type with depressive features, that this is a mental disease akin to schizophrenia, and that he was suffering from this disease on November 17, 1955, the date of the crimes. He specifically testified, on cross examination, that Isaac did not know the difference between right and wrong during his stay at St. Elizabeths. The second doctor based his testimony upon his examinations and "pertinent factors in this man's history". His diagnosis was schizophrenic reaction, catatonic type, which had been progressing for some two-and-a-half years prior to admission to the hospital. It was his view that it was likely defendant was mentally ill on November 17, 1955. He expressed as his opinion that the acts committed by Isaac on November 17, 1955, were the product of his mental disease. The third doctor testified that he participated with Isaac in group therapy approximately a hundred and seventy-five times during the two-and-a-half-year period. His diagnosis was schizophrenic reaction in partial remission—the most common type of insanity, classified as a psychosis—and a disassociative reaction. The opinion of the witness was that on November 17, 1955, Isaac was psychotic and the acts charged "would be a product of psychosis", "a product of that mental condition." He added that Isaac could not tell the difference between right and wrong at the time he was in the disassociative state. The psychologist testified that the tests given Isaac gave results consistent with the thinking shown by patients who have a schizophrenic reaction of the catatonic type. The testimony we have sketched was in great detail and was subjected to rigorous cross examination.

The defense rested. The prosecutor then had to meet a burden of estab-

---

1. See Curley v. United States, 81 U.S.App. D.C. 389, 160 F.2d 229 (D.C.Cir. 1947), certiorari denied 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

lishing beyond a reasonable doubt the sanity of the accused. This is the rule of the Davis case,[2] which has been the law in our federal courts for over sixty years.

To meet its burden the prosecution called one psychiatrist and recalled Isaac's common-law wife to the stand. The testimony of the doctor was brief. He said that he had seen Isaac at the hospital many times, and the following question and answer were asked and given:

"[Q.] Now, are you able to express an opinion as to his mental condition on November the 17th of 1955?

"[A.] No, I do not feel that I could—that I am able or have been able to form a firm or a valid opinion regarding what his mental condition was in the middle of November, 1955, because that was over three months, almost three months and a half before I ever saw Mr. Isaac."

The rebuttal testimony of the other witness, the woman with whom Isaac had lived and who was the mother of the children, was likewise brief. She said that Isaac had never complained to her about headaches or mental illness, that nothing unusual in his actions indicated to her that he was suffering from any mental illness, and that in her opinion he was of sound mind.

We think we need go no further than the foregoing recitation of the evidence in order to demonstrate that the prosecution failed entirely to sustain its burden. It simply did not establish the sanity of the accused. The evidence on behalf of the defense was extended and impressive. To all practical intent there was no contrary evidence. Indeed, when the prosecutor came to address the jury, he said, in part:

"So I say, ladies and gentlemen of the jury, as Doctor Cushard told you,

that it would be impossible to tell this man's mental condition on November 17th if you didn't see him until eight or nine or, I believe, even four months after this crime happened."

This statement of the prosecutor may not have made a completely accurate reflection of what the Doctor had said, but it is a noteworthy statement of the prosecutor's view. If the Government found it impossible to adduce any testimony concerning Isaac's mental condition on the date of the acts charged, then, in the light of the evidence presented by this defense, the Government by its own admission had failed to sustain its burden of proof.

■ The charge to the jury was confusing on the defense of insanity. As we have said, the law in all federal jurisdictions, under a Supreme Court ruling,[3] is and has been for more than half a century that, when a defendant in a criminal case introduces enough evidence of insanity to overcome the presumption of sanity, a burden thereupon falls upon the Government to establish sanity beyond a reasonable doubt. In the case at bar the trial judge instructed the jury:

" * * * It is asserted on behalf of the defendant that he did not have the mental capacity to commit the crimes with which he is charged because he was insane at the time the crimes were committed.

"If you find this to be the case then your verdict should be as to each count not guilty by reason of insanity."

And again:

"If you reach the conclusion that the defendant was suffering from a mental disease or a mental defect, and also that the criminal act was the result or product of the mental

---

2. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

3. Davis v. United States, supra; Douglas v. United States, 99 U.S.App.D.C. 232,

239 F.2d 52 (D.C.Cir. 1956); Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (D.C.Cir. 1957).

disease or mental defect, you may bring in a verdict of not guilty by reason of insanity."

And again the court instructed:

"If you find that the defendant was suffering from a mental disease or mental defect at the time of the commission of the alleged offense that is not sufficient to justify a verdict of not guilty because of insanity unless you find that the crime was produced by the insanity."

The statements to the effect that in order to render a verdict of not guilty by reason of insanity the jury, in this case as it was submitted to them, must find that the accused suffered from a mental disease and that his acts were the product of the disease, were erroneous. Those statements ignored the burden which was on the prosecution under the Davis case. It is true that the court correctly stated to the jury several times that the burden of proof was on the Government to establish beyond a reasonable doubt that the accused was not suffering from a mental disease or that the acts were not the product of a mental disease. The two conflicting views of the law, the erroneous and the correct, as to the burden of proof were repeated several times in this charge. We cannot speculate that the correct statements obliterated in the minds of the jurors the repeated erroneous statements. We recognize that the problems posed by the burden-of-proof rule in respect to the defense of insanity are somewhat difficult, but the rule of law is plain and absolutely certain. It should be made plain and certain to juries in such cases.[4]

We come now to consider the disposition of the case. At the end of the Government's case-in-chief counsel for the defense moved for a directed judgment of acquittal by reason of insufficiency of the evidence. At the close of all the evidence counsel renewed that motion and also moved for a directed judgment of acquittal by reason of insanity. These motions were denied. In his opening statement counsel told the jury: "The primary issue which will be raised by the defendant in his defense is that of insanity * * *." He made no statement of any other defense. In his closing argument defense counsel told the jury: "As I stated to you in my opening argument, the defense in this case is that of insanity." His argument was devoted to the discussion of the evidence concerning the mental condition of the accused at the time of the alleged offense. At the end of his argument counsel told the jury: "It is a serious matter to the defendant, and I trust * * * that you will find, beyond a reasonable doubt and bring back a verdict the defendant is not guilty by reason of insanity." He asked for no other verdict. Nevertheless the court instructed the jury on first-degree murder, and on second-degree murder upon the basis that there was evidence of drunkenness which, the court told the jury, might negative the premeditation and deliberation which was requisite for first-degree; and the court further instructed the jury that the verdict on Count 1 (the murder count) might be guilty of murder in the first degree, guilty of murder in the second degree, not guilty, or not guilty by reason of insanity. The verdict, as we have indicated, was "Guilty as charged."

Under the foregoing circumstances we do not have before us the problem which might be presented if the court had not presented to the jury the opportunity for it to return a verdict of not guilty. Whether the judge was required to follow the course he followed we need not consider; it was certainly a prudent and cautious course. Thus the question is similar to the one posed in Douglas v. United States.[5] There we said that in an appropriate case the court should set aside a verdict of guilty and direct a verdict of not guilty by rea-

4. See Kwosek v. State, Wis., 100 N.W.2d 339 (1960).

5. 99 U.S.App.D.C. 232, 239 F.2d 52 (D.C. Cir. 1956).

son of insanity. We did not follow that course in that case, because part of the evidence presented was deemed inadmissible and because there were ambiguities in the testimony. But we are constrained to take that course in the present case. Having submitted to the jury the possibility of a verdict of not guilty, and the jury having rejected that verdict, the court should have set aside the verdict of guilty and directed a verdict of not guilty by reason of insanity.

■ Inasmuch as we are of opinion the trial court should have directed a judgment of acquittal by reason of insanity, notwithstanding the verdict, we now vacate the judgment and remand the case with directions to enter such a judgment of acquittal and an order committing Isaac to a hospital for the mentally ill until such time as two events occur: First, the superintendent of the hospital certifies to three conclusions, based upon his expert professional opinion—(a) Isaac is not suffering from a mental condition which (b) renders him dangerous to himself or to others in the reasonable future,[6] and (c) he is entitled to an unconditional release; or the superintendent certifies that Isaac is not suffering from such a mental illness as that, if placed under the conditions specified in the certificate, he would be dangerous to himself or to others in the reasonable future, and that he is entitled to be conditionally released under supervision. The second event necessary to release, premised upon the first as just described, is a proceeding in the court in which the person was tried. That court, in the exercise of a judicial judgment and in the absence of objection by the United States or the District of Columbia (whichever was the prosecuting authority), may accept the certificate of the superintendent and order the release of the person. But the court in the exercise of its judicial discretion may hold a hearing, and, if the prosecuting authority (either the United States or the District of Columbia) objects to the acceptance of the superintendent's certificate, the court must hold a hearing. At the hearing such evidence is to be received, including that of expert witnesses, as may be appropriate or desirable upon the several points at issue. Upon such evidence the court must make findings. If upon the evidence the court finds that the person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court must order a release unconditionally. If the court's conclusion, either by acceptance of a certificate to that effect or upon findings, is that the person has not recovered his sanity but that he will not in the reasonable future be dangerous to himself or to others under conditions approved by the court,[7] and is in a condition to be conditionally released under supervision, the court may order a release upon conditions or it may return the person to the hospital. Thus the release of a person committed to a hospital for the mentally ill pursuant to a verdict of not guilty by reason of insanity in a criminal case requires either the acquiescence of the superintendent of the hospital, the prosecuting authority, and the trial court, or findings by the trial court upon evidence received in an open record, giving, of course, due weight to the certificate of the superintendent. The acquiescence or the findings must be upon the conclusions we have mentioned—the recovery of sanity, the harmlessness in the reasonable future, and the entitlement to release—for unconditional release, and upon the latter two for conditional release. The part of the court in the release procedure is not *pro forma* or merely technical; it is the performance of judicial acts, dependent solely upon the evidence and the judicial judgment of the court. The

6. Overholser v. Leach, 103 U.S.App.D.C. 289, 257 F.2d 667 (D.C.Cir. 1958), certiorari denied 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038 (1959).

7. Hough v. United States, 106 U.S.App. D.C. 192, 271 F.2d 458 (D.C.Cir. 1959).

requirements were spelled out by the Congress in the act of August 9, 1955, which now appears as Section 301(e), Title 24, of the District of Columbia Code (1951 ed., Supp. VII).[8]

Reversed.