Dallas O. WILLIAMS, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16819.

United States Court of Appeals
District of Columbia Circuit.

Argued May 25, 1962.

Decided Nov. 23, 1962.

Petition for Rehearing En Banc Denied
En Banc Jan. 16, 1963.

. See, also, D.C., 165 F.Supp. 879.

Mr. James J. Laughlin, Washington, D.
C. (appointed by this court), for appellant.

Mr. Anthony G. Amsterdam, Asst. U.
S. Atty., with whom Messrs. David C.
Acheson, U. S. Atty., Nathan J. Paulson,
Asst. U. S. Atty. at the time of argument, and Frederick G. Smithson, Asst.

U. S. Atty., were on the brief, for appellee.

Before WASHINGTON, BURGER and WRIGHT, Circuit Judges.

WRIGHT, Circuit Judge.

On March 15, 1961, Dallas O. Williams shot and killed two men. He was committed to St. Elizabeths Hospital under 18 U.S.C. § 4244 for mental examination to determine whether he was competent to stand trial. That examination disclosed that he was competent and the District Judge so found. A seven-day trial followed, during which Williams relied primarily on the defense of insanity. Eleven psychiatrists,[1] one psychologist, four lay witnesses and appellant himself testified on this issue. But the defense did not prevail. Williams was convicted on all counts[2] and sentenced to serve from 21 to 61 years in the penitentiary.[3] He now appeals, asserting that a directed verdict of not guilty by reason of insanity should have been entered. He further complains that the psychologist's medical conclusions were improperly excluded.

Dallas Williams is not a newcomer to this court, or to courts generally. Without counting many other brushes with the law, by 1949, at the age of only 34 and despite incarceration during most of his adult life, he had been convicted of ten crimes of violence.[4] That year he was indicted for assault with a deadly weapon. Five trials were had on this charge between 1950 and 1956, three of them resulting in convictions subsequently vacated by this court. See Williams v. United States, 102 U.S.App.D.C. 51, 52, 250 F.2d 19, 20 (1957).[5] In the meantime, in 1952, while on bail between the first and second trials, and again in 1956, between the fourth and fifth trials, he committed other offenses. See Williams v. United States, D.C.Mun.App., 104 A. 2d 828 (1954); Williams v. United States, D.C.Mun.App., 133 A.2d 112 (1957).

Following the reversal of his last conviction on the assault charge, and pursuant to this court's suggestion, the United States Attorney initiated civil commitment proceedings against Williams. But the Government's application was fatally defective because it

---

1. Among the psychiatrists were two who had examined appellant at Government expense pursuant to a pre-trial order granting his motion for examination by psychiatrists unconnected with a Government institution.

2. Appellant was indicted in three counts, each of the first two charging first degree murder of one of the victims and the third charging the offense of carrying a dangerous weapon without a license. The jury returned a verdict of second degree murder on the first two counts. On the last count Williams was found guilty as charged.

3. The sentence provided commitment for 10 to 30 years on each of the murder counts and one year on the last count.

4. See the chronology recited in Williams v. United States, 102 U.S.App.D.C. 51, 53, n. 3, 250 F.2d 19, 21, n. 3 (1957).

5. As stated in the cited opinion, the first trial resulted in a conviction vacated here on the Government's confession of error; the second and third were mistrials; the conviction obtained on the fourth trial

was set aside because appellant had been denied an opportunity to show his incompetence to stand trial; and the final conviction was reversed on the ground that appellant, by then, had been denied his constitutional right to a speedy trial.

It may be noted that after the 1949 shooting Williams was "confined for a total of about seven years * * *—about six years in jail and about a year in St. Elizabeths Hospital." Williams v. United States, 102 U.S.App.D.C. 51, 52, 250 F.2d 19, 20 (1957). The citation in the text is to the report of the opinion rendered in 1957 on appeal from the last conviction. The prior decisions of the court relating to this charge are not reported. Williams v. United States, No. 11,006, May 3, 1952, order granting Government's motion to remand for new trial; Williams v. United States, No. 12,349, April 21, 1955 (en banc), order reversing conviction and remanding for new trial. See also, Williams v. United States, 88 U.S.App.D.C. 212, 188 F.2d 41 (1951), in which this court liberally construed the Rules of Criminal Procedure to permit an appeal from the first conviction.

could not show existence of mental disease, and appellant promptly obtained his release from St. Elizabeths Hospital on habeas corpus. In re Williams, D.D. C., 157 F.Supp. 871 (1958). This court affirmed the order of discharge "without prejudice to * * * additional proceedings." Overholser v. Williams, 102 U.S.App.D.C. 248, 252 F.2d 629 (1958).

Within two weeks of his release on February 3, 1958, Williams was arrested on an intoxication charge. The Municipal Judge refused his plea of guilty and, finding that he was "of unsound mind," directed that he be confined in St. Elizabeths. But, since this was not a determination that appellant was incompetent to stand trial under the standard announced by Section 24–301(a) of the District of Columbia Code, his detention was declared illegal in habeas corpus proceedings instituted in the United States District Court. Williams v. Overholser, D.D.C., 162 F.Supp. 514 (1958), modified and affirmed, 104 U.S.App.D.C. 18, 259 F.2d 175 (1958). The Municipal Court then held a hearing, determined Williams competent to stand trial, and, again refusing his guilty plea, proceeded to trial "on the merits." Without the benefit of any testimony bearing on the question of his mental condition, the judge found appellant "not guilty by reason of insanity" and again committed him to St. Elizabeths, this time invoking 24 D.C.Code § 301(d). This action was challenged by habeas corpus in the District Court. There Judge Youngdahl, while pointing out the inadequacy of the finding and suggesting civil commitment proceedings, held that the proper remedy was by appeal to the Municipal Court of Appeals, where the case was already lodged. In re Williams, D.D.C.,

165 F.Supp. 879 (1958). In January, 1959, that court reversed the finding of insanity. Williams v. District of Columbia, D.C.Mun.App., 147 A.2d 773 (1959). Once more, it was suggested that the civil commitment procedure be invoked. But, as we shall see, it was not invoked. Two years later, these murders occurred.

This history shows not only Williams' failure to adjust to society, but society's failure to find a satisfactory means of restraining offenders of his sort. It is a history which we recount because it is, in a sense, the foundation for this appeal. Indeed, the argument here, between the Government and appellant, and between two groups of experts, is essentially whether Williams' criminal record, heavily drawn on at his trial, indicates that his latest crime is the product of a diseased mind.

 The history shows that Williams is a confirmed criminal, a "recidivist" in the parlance of the penologists. But that fact alone does not require that he be committed to a hospital rather than the penitentiary. A long criminal record does not excuse crime.[6] True, the record also shows that appellant was on several occasions found temporarily incompetent to stand trial. But, without long delay, he was, in each instance, later certified as competent. That is not, of course, equivalent to a finding that he was responsible for his crimes. However, there are other important facts disclosed by the public records.

The first is that not once in his many trials was Williams acquitted by a jury on the ground of insanity.[7] One Municipal Judge so ruled, over appellant's strenuous objection, but that finding was subsequently vacated as made on no evidence.[8] The other relevant point is that

6. Compare Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853 (1961). See also A.L.I. Model Penal Code § 4.01 (2) (Proposed Official Draft, May 4, 1962, adopted at the 39th Annual Meeting of the American Law Institute, May, 1962).

7. The question whether a directed verdict of acquittal by reason of insanity should

have been entered was raised in Williams v. United States, 102 U.S.App.D.C. 51, 250 F.2d 19 (1957), but disposition of the case on another ground made resolution of that point unnecessary.

8. See Williams v. District of Columbia, D.C.Mun.App., 147 A.2d 773 (1959).

the Government, having once been unable to even *allege* existence of mental disease, did not again attempt civil commitment of Williams, despite reiterated suggestion by this court,[9] the District Court,[10] and the Municipal Court of Appeals.[11] We cannot assume the Government was insensitive to these proddings or indifferent to the obvious danger to the public in Williams' remaining at large. On the contrary, the only reasonable inference from official non-action in this direction is that the available evidence simply would not support the necessary allegation of insanity.[12]

■ It is against this background that we must decide the prime issue in this case: Did the evidence, as a matter of law, fail to establish beyond a reasonable doubt that the offenses charged were not the product of mental disease or mental defect? If so, a directed verdict of acquittal by reason of insanity should have been entered by the trial court.[13]

■ We pose the question in this way because it is clear beyond cavil that appellant's sanity was a legitimate issue in the case. Indeed, five psychiatrists testified that Williams was a "psychopath" or "sociopath" on the day of the killings and at least some of them thought this condition a "mental disease." Without any evidence relating the abnormality to the offenses, this was enough to raise the issue and require the Government to disprove the claim that the crimes were the product of mental disease or defect beyond a reasonable doubt.[14] We conclude, however, that although the defendant's evidence relating to insanity was sufficient to make the issue, it was not so strong, when considered with the evidence offered by the Government, as to require a directed verdict of acquittal by reason thereof.

■ The psychiatric testimony is summarized below.[15] The analysis shows

9. See Williams v. United States, 102 U.S. App.D.C. 51, 58, 250 F.2d 19, 26 (1957); Overholser v. Williams, 102 U.S.App.D.C. 248, 249, 252 F.2d 629, 630 (1958); Williams v. Overholser, 104 U.S.App.D.C. 18, 20, 259 F.2d 175, 177 (1958).

10. See In re Williams, D.D.C., 165 F.Supp. 879, 883 (1958).

11. See Williams v. District of Columbia, D.C.Mun.App., 147 A.2d 773, 776 (1959).

12. Under 21 D.C.Code §§ 310, 311, lunacy proceedings (whether relating to a person at large or a person arrested under the provisions of §§ 326 or 327) are initiated by the filing, in the United States District Court, of a verified petition alleging the "insanity or unsoundness of mind" of the individual in question and the facts supporting that conclusion, together with the affidavits of two or more "responsible residents" of the District reciting, inter alia, their belief that the person is "insane or of unsound mind," that he "is not fit to be at large or go unrestrained," that if he is "permitted to remain at liberty the rights of persons and property will be jeopardized or the preservation of public peace imperiled or the commission of crime rendered probable," and that he "is a fit subject for treatment by reason of his * * * mental condition." In Williams' case, there could be no difficulty

in alleging, or proving, the danger to the public from his remaining at large. The stumbling block was, and apparently still is, that he cannot be certified "insane or of unsound mind." See Overholser v. Williams, 102 U.S.App.D.C. 248, 252 F. 2d 629 (1958).

13. See McDonald v. United States, 114 U. S.App.D.C. ——, 312 F.2d 847 (No. 16,304, decided October 8, 1962). Compare Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960); Satterwhite v. United States, 105 U.S.App.D.C. 398, 267 F.2d 675 (1959); Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878 (1957); Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (1957); Douglas v. United States, 99 U.S.App.D. C. 232, 239 F.2d 52 (1956).

14. Davis v. United States, 160 U.S. 469, 486–488, 16 S.Ct. 353, 40 L.Ed. 499 (1895); McDonald v. United States, supra Note 13; compare Tatum v. United States, 88 U.S.App.D.C. 386, 190 F.2d 612 (1951).

15. Dr. Robert P. Odenwald, a psychiatrist in private practice called by the defense, who examined appellant in October, 1961, found him to be suffering from sociopathic personality with alcoholism, brain damage and undifferentiated mental disorder, which conditions he thought probably ex-

that while nine psychiatrists, many of them possibly influenced by appellant's long criminal career, labelled Williams a "sociopathic personality," or thought him otherwise mentally unbalanced on the crucial date, only six characterized his condition as a "mental disease or defect," and, of these six, only three could say the killings in question were the product of that disorder. The net of it is, then, that of eleven psychiatrists called, the great majority could not relate the offenses to a mental disease or mental defect. In the circumstances, we cannot say reasonable men must necessarily, and as a matter of law, have entertained a reasonable doubt as to appellant's legal responsibility for his acts.[16]

isted on March 15, the date of the killings. He thought the offenses were the product of these mental disorders.

Dr. Francis Regis Riesenman, a psychiatrist and neurologist associated for 14 years with St. Elizabeths Hospital, called by the defense, testified, on the basis of an examination in April, 1958, that appellant suffered from sociopathic personality, antisocial reaction, so severe as to constitute "longitudinal" psychosis. He also thought the killings were a product of these mental disorders.

Dr. Mauris M. Platkin, a staff psychiatrist at St. Elizabeths for seven years, testified for the defense that he had examined appellant in 1957, on the occasion of two admissions in 1958, and several times in 1961, and found him to be suffering from a very mild chronic brain syndrome. It was the doctor's view that this condition did not cause appellant to commit the offenses charged.

Dr. William G. Cushard, a defense psychiatrist, 32 years at St. Elizabeths Hospital and one-time Clinical Director of the John Howard Pavilion there, who had examined Williams on several occasions, including March and June of 1961, thought he suffered a mild brain syndrome, which the doctor could not characterize as a mental disease. In Dr. Cushard's view, there was no causal connection between the killings and appellant's mental condition.

Dr. Gerhart J. Gordon, a psychiatrist with 26 years of institutional experience, presently Clinical Director and Assistant Chief Psychiatrist at D. C. General Hospital, was called by the defense and testified, on the basis of an examination in 1953, that appellant was a sociopath and that his condition, combined with the intake of alcohol, probably caused him to commit the killings. However, Dr. Gordon was of the view that sociopathic personality is not a disease.

Dr. Brigitte Julian, a defense psychiatrist who completed her psychiatric residency and joined the staff at St. Elizabeths in January, 1961, examined appellant in June, 1961, and found him to be suffering from chronic brain syndrome and sociopathic personality. She believed the offenses were a product of these mental disorders.

Dr. John D. Schultz, called by the defense, six years a staff psychiatrist at D. C. General Hospital, having examined Williams in 1958, concluded that he suffered from undifferentiated psychosis, including sociopathy. He could not state whether the offenses were causally related to this condition.

Dr. Dorothy S. Dobbs, a staff psychiatrist at St. Elizabeths for one year, who was called by the defense, said, on the basis of an examination in June, 1961, that appellant suffered a relatively mild chronic brain syndrome. In her view, this was unconnected with the offenses.

Dr. Mary V. McIndoo, for six years a staff psychiatrist at D. C. General Hospital and for two years its Chief Psychiatrist, testified, on behalf of the defense, that appellant suffered from "schizophrenia" in 1958 when she had examined him, and that this disease was probably still active on the date of the killings. She thought the offenses might be a product of this condition.

Dr. David J. Owens, a psychiatrist attached to St. Elizabeths for seven years and recently Clinical Director of John Howard Pavilion there, testified for the Government on rebuttal and, on the basis of examinations in 1958, 1959 and 1961, concluded that appellant was without mental disease or defect. He expressly negated the diagnoses of chronic brain syndrome, sociopathic personality, and psychosis.

Dr. John R. Cavanaugh, a private psychiatrist of considerable experience, who testified for the Government, had examined Williams in 1953 and again in October, 1961, and found him to be of sound mind. He also contradicted the findings of sociopathic personality, schizophrenia, and undifferentiated psychosis.

16. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v.

This conflict in medical evidence could only be resolved by the jury.

 The second point pressed on this appeal relates to the exclusion of the conclusory portions of a report by a psychologist. Though the psychologist was permitted to testify as to the results of tests she had administered, her ultimate conclusion that "these results are consistent with all previous ones in their indication that this man is suffering from the effects of organic damage to the central nervous system," incorporated in a written report offered in evidence by the defense, was ruled inadmissible on the ground that a psychologist, who is not a medical doctor, is incompetent "to give a medical opinion as to a mental disorder." That ruling is said to be contrary to our decision in Jenkins v. United States.[17]

Assuming arguendo that it was error to exclude the conclusions of the psychologist, under our en banc opinion in Jenkins rendered June 7, 1962, we hold that the error was harmless because on this record the witness' opinions would only be cumulative. The psychologist herself had already testified as to her concrete findings, which were more relevant than her ultimate conclusion, and had at least indicated her view that appellant was afflicted with a "brain syndrome." Moreover, the same evidence was before the jury in the testimony of several of the psychiatrists, some of whom expressly based their conclusion of organic brain damage on the psychologist's findings.

 We conclude that appellant's trial was free of prejudicial error and that his conviction must be affirmed. In so doing, however, we do not foreclose the possibility of a further inquiry, by the proper authorities, whether his sentence should be served in the penitentiary or a mental hospital. Indeed, under the general law, 18 U.S.C. § 4241, and the District of Columbia Code, § 24-302, any prisoner found to be "mentally ill" may be transferred to a mental hospital. It may well be that Williams is a proper candidate for such action.

Affirmed.

---

United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). See Martin v. United States, 109 U.S.App.D.C. 83, 86, 284 F.2d 217, 220 (1960).

17. Appellant alludes to the original decision by a panel of the court, entered October 26, 1961, which was vacated on January 15, 1962, when the petition for rehearing en banc was granted. Before the present appeal was heard, the court had rendered its final decision in Jenkins by order dated April 12, 1962, apparently affirming the action of the panel. But the opinion of the court en banc, treating the matter of psychological testimony somewhat differently, was not issued until June 7, 1962. Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F. 2d 637. Had the latter opinion been published at the time of the argument here, the point now under consideration might have been abandoned. But, in fairness to the appellant, we consider it anyway.