UNITED STATES of America

v.

Elroy F. CARTER, Appellant.

No. 22912.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1970.

Decided June 5, 1970.

Mr. John A. Nevius, Washington, D.C. (appointed by this court), with whom Mr. William R. Stratton, Washington, D.C., was on the brief, for appellant.

Mr. James L. Lyons, Asst. U. S. Atty., with whom Messrs. Thomas ·A. Flannery, U. S. Atty., John A. Terry, and Richard A. Hibey, Asst. U. S. Attys.,· were on the brief, for appellee. Mr. Roger E. Zuckerman, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, TAMM, Circuit Judge, and JAMESON,* Senior District Judge.

PER CURIAM:

Found guilty after having waived his right to a jury trial on charges of both robbery (22 D.C.Code § 2901 (Supp. III 1970)) and assault with a dangerous weapon (22 D.C.Code § 502 (1967)), appellant contends before us that the trial court should have granted his motion for a judgment of acquittal upon the ground of mental illness. Without in any way challenging the allegations regarding his participation in the crimes charged, appellant, admittedly a narcotic addict, argues that the evidence of his narcotic addiction, when weighed with the testimony of two psychiatrists and a psychologist called by the appellant, should have compelled the trial judge to grant the motion for judgment of acquittal by reason of insanity.

## I.

Prior to trial appellant was committed to St. Elizabeths Hospital, and in due course he was certified competent to stand trial. Three members of the staff at St. Elizabeths who had examined appellant during his confinement there testified at length regarding his mental condition, and he also called as a witness one of the police officers who had observed his condition shortly after his arrest. The trial judge, in ruling upon appellant's motion for judgment of acquittal, first observed that had there been a jury in the case he would have been required to submit the question of appellant's mental capacity to that body (Tr. 199)—obviously to determine as a matter of fact whether the evidence established appellant's capacity beyond a reasonable doubt.

The trial judge thereafter summarized his findings and conclusions as to the appellant's guilt and mental condition. He found:

That the crime[s] charged were committed and that appellant participated in them. (Tr. 200.)

That appellant's participation was to such an extent that he could be found guilty if there was no causal connection between the crime and the mental disease. (Tr. 200.)

That appellant is suffering from an anxiety reaction and was suffering from an anxiety reaction at the time the crime[s] were committed. (Tr. 199.)

That the anxiety reaction is recognized in psychiatric journals and bulletins as a mental disease. (Tr. 200.)

That the anxiety reaction from which appellant suffered was a "mild" or "moderate" one which permitted the appellant or any other person "in a like situation to exercise control over himself, to restrain himself, and otherwise to function in a normally acceptable way within society." (Tr. 200.)

That appellant "is and was" a narcotic addict at the time the crime[s] were committed. (Tr. 200.)

---

* Sitting by designation pursuant to the provisions of Title 28, U.S.Code, Section 294(d).

That the record was unclear as to whether appellant used drugs to alleviate his anxiety reaction or for some other reason. (Tr. 201.)

That, whatever was the reason for appellant's narcotic addition, the use of narcotics can under certain circumstances alleviate the anxiety which is the mental disease from which appellant suffered. (Tr. 201.)

That at the time of the perpetration of the crime[s] and although appellant was then suffering from "a mental disease * * * a moderate form of anxiety reaction," he was nevertheless "a highly intelligent person, he was able to plan, he was able to execute" and he was "capable of refraining from doing the acts which constitute the crime[s]." (Tr. 201–202.)

That at the time appellant committed the crime[s] "he was not suffering any withdrawal symptoms so that there was no compulsive or impulsive situation which caused him to do the acts which constitute the crime[s]," and that "[h]e was able to plan and to execute it, and he was able to refrain [from doing it]." (Tr. 202.)

That the testimony indicated that appellant was at the time of the commission of the offense "high" on drugs, and that "a drug addict who is in such a condition is more capable of controlling his behavior than the average person since the anxiety reaction from which all of us suffer to some degree was completely blanketed by the effect of the drugs." (Tr. 202.)

From these findings of fact the trial judge concluded that "the crime became one of convenience rather than a crime of necessity." (Tr. 202.) He rejected, upon the basis of these findings and this conclusion, the theory of appellant that the crime was "tied" to the mental disease.

We have reviewed the entire record of the testimony offered upon the subject of appellant's mental condition prior to and at the time of the commission of the offenses. With this testimony, as with almost all testimony, it is possible to select excerpts out of context and to argue forcefully in support of any conclusion which the advocate seeks; obviously the trial judge, acting also as the trier of facts in this case, is far more accurate in his appraisal of the credibility of the witnesses and the factual elements establishing truth than we, faced with a cold record, can possibly be. It is, of course, the sole responsibility of the trier of facts to evaluate the testimony of the witnesses and to determine what weight, if any, should be given to the testimony of each witness. This basic principle was forcefully stated by Chief Judge Bazelon in his recent opinion for this court in Adams v. United States, 134 U.S.App.D.C. 137, 142, 413 F.2d 411, 416 (1969):

> The decisions of this jurisdiction have made clear * * * our reluctance to require a directed acquittal for insanity. We have upon occasion refused to find that the Government has not borne its burden even when the evidence of mental illness was uncontradicted. * * * We have emphasized time and again that "in view of the complicated nature of the decision to be made—intertwining moral, legal and medical judgments—" the insanity defense is peculiarly apt for resolution by the jury. As part of its task, "The jury is free to believe any reasonable 'estimate' even though different or contrary views may also be reasonable."

The *Adams* decision also makes clear that the governing principles are identical when the court rather than the jury is the trier of fact. (*Id.*) We cannot say upon the basis of our review of the testimony that the above findings and conclusions are not reasonable or that they are not supported by substantial testimony. We therefore have no authority to ignore or overrule them.

## II.

■ Appellant also challenges his sentence in this case upon the ground that the trial judge should have referred the case to the Legal Psychiatric Service for presentence evaluation. We noted above that appellant was committed to St. Elizabeths Hospital for mental observation on November 21, 1967 and was reported competent to stand trial on February 20, 1968. These data were before the trial judge at the time of sentencing. During the trial, the presiding judge heard the testimony of several witnesses as to appellant's mental condition. (Tr. 123–124, 129–154, 160–171, 179–196.) Some six weeks elapsed between the finding of guilt and the imposition of sentence, during which the probation office conducted an investigation and submitted a report which was before the trial judge when sentence was imposed, and which had been "gone over * * * rather carefully." (Sent. Tr. 4.) In addition, the court considered a sentencing report prepared in appellant's behalf by the Offender Rehabilitation Project (Sent. Tr. 4), and at the sentencing appellant made no request for further psychiatric examination. Upon the basis of this record we are unable and unwilling to conclude that the trial judge in any way abrogated or abused the discretion residing in him in the imposition of these sentences.

Affirmed.

1. Adams v. United States, 134 U.S.App. D.C. 137, 142, 143, 413 F.2d 411, 416–417 (1969); Gaskins v. United States, 133 U.S.App.D.C. 288, 289–292, 410 F. 2d 987 (1967); Washington v. United States, 129 U.S.App.D.C. 29, 30–31, 38–39, 390 F.2d 444, 445–446, 453–454 (1967); King v. United States, 125 U.S.App.D.C. 318, 320–324, 372 F.2d 383, 385–389 (1966).

2. Although appellant presented no evidence on the issue other than his own testimony, he did dispute the government's claim that he was holding the box in which the money from the robbery was placed. The trial court, sitting without a jury, did not appear to regard this question as material.

BAZELON, Chief Judge (concurring):

I agree that under our present case law the evidence in this case provided no single answer to the complex question of criminal responsibility raised by the insanity defense, and that in consequence that question had to be decided by the trier of fact.[1] Accordingly, I join the opinion of the Court. In my view, however, our responsibility for the proper administration of the insanity defense in the District of Columbia can best be fulfilled by a somewhat fuller discussion of the issues.

## I.

The charges in this case arose out of the armed robbery of a liquor store. Three men, including the appellant here, participated in the robbery. Two police officers observed the robbers leaving the store and gave chase; the episode ended when the robbers' automobile struck a tree and overturned. Appellant did not seek to challenge the substance of the government's version of the offense,[2] and the facts of the robbery were stipulated. The only issue at trial was that of criminal responsibility.

The expert testimony at trial, while sparse,[3] was not in substantial conflict. When appellant was four years old, his mother died. His father, who until then had been a good provider, took to drink. There was from that time no one specif-

3. This may have been due at least in part to the brevity of the doctors' contacts with appellant, who spent 60 days at St. Elizabeths. Dr. Baughmann, a staff psychiatrist at St. Elizabeths, interviewed appellant three times, for a total of perhaps three hours; in addition, he saw him at a staff conference and utilized reports of psychological tests given at the hospital and some reports from Boys' Village in Maryland and the Baltimore Department of Public Welfare. Dr. Hamman, a psychiatrist also on the staff at St. Elizabeths, interviewed appellant for "40 minutes to an hour" at the staff conference; in addition he conferred with Dr. Baughmann at the conference. Dr. Hamman, although he did not think the psychological tests were necessary for a

ic person taking care of the children: appellant was cared for in sequence by one of the several different women living with his father during the next few years. Eventually, he ran away; when he was returned, his surrogate mother beat him so badly that he was hospitalized. At this point he was made a public ward; the remainder of his childhood, he shuttled among five different foster homes and Boys' Village.[4] At the age of 17, he was found to have been involved in a housebreaking; when he subsequently attempted to join the Army, he was rejected because of his record. Nevertheless, he made for some time a good adjustment: he took employment as a skilled laborer, and had found a girl whom he planned to marry. When their son died of meningitis at the age of four months, however, the relationship broke up.

The doctors agreed that appellant was plagued by "fear without an apparent rational basis for this fear." The two psychiatrists characterized his symptoms as "anxiety reaction" or "anxiety neurosis": [5]

[This] means a person is in a continual state of tension or anxiety. Most of the time there is no overt—there is no logical reason for the anxiety. It comes from internal conflicts, and this anxiety may express itself in many ways, at many different times, inability to hold a job, inability to stick to anything, and the degree of anxiety has to do with the degree of impairment in the individual's functioning.

\* \* \* \* \* \*

Ordinarily there is no specific behavior that goes along with anxiety. A person who has anxiety either suffers it or tries some way of getting away from it.

Appellant found a way. He had grown up and lived in an environment where drugs were readily available; and, on occasion, he had taken narcotics. After the death of his son and the breakup of his impending marriage, his anxieties became worse. But he "found something which worked very well in terms of alleviating the symptoms of anxiety, and that was taking narcotics." As Dr. Baughmann testified,

most drug addicts that I have talked to describe a good feeling, a high feeling that they get when taking the drugs. They take it because it makes them feel good, because they get kicks out of it; whereas Mr. Carter takes drugs, I believe, in order not to feel bad. He doesn't seem to be the type of individual that especially enjoys the drugs.

\* \* \* \* \* \*

[D]rug addiction to Mr. Carter is like the medicine that he takes because of his anxiety reaction.[6]

---

diagnosis, did review them and concluded that they substantiated his diagnosis. He did not, apparently, rely upon any other hospital records in forming his opinion. Finally, Dr. Williams, a staff psychologist at St. Elizabeths, based her opinion upon a battery of five psychological tests which she administered to appellant during two two-hour test periods.

4. This information was obtained from appellant and substantiated through the records of the Baltimore Department of Public Welfare. The basis for the other information set forth appears to be statements by appellant.

5. Dr. Williams, the psychologist, agreed that appellant suffered from "a great deal of tension." She preferred, however, to characterize appellant as "having pseudo sociopathic schizophrenic condition with obsessive compulsion and paranoid features." She explained this formidable phrase as meaning that "this young man was experiencing strong tensions. He could not cope with them. He could not cope with these feelings which we call ego-alïen feelings and the tension would build up. He would then act out.

"When I say a schizophrenic condition, there was evidence that he has thoughts and feelings which normal people do not have."

No attempt was made further to pursue the question how appellant might have acted out his tensions.

6. For appellant's condition, Dr. Hamman testified, heroin is "the best medicine there is. We would use it on all anxiety

* * * * * *

[Without drugs, h]e would feel very anxious and very uncomfortable. He might even, if he took neither drugs nor got any other kind of help for his mental illness, he might even become a psychotic, schizophrenic.

At the time of the robbery, appellant's habit required some twenty capsules of heroin per day. Regarding his character structure apart from the anxiety and the addiction, the expert testimony conflicted. Both doctors agreed that appellant was brighter than normal; his I.Q. had been measured at the hospital as being 119, and there was evidence that his performance might have been higher had not his abilities been impaired by his anxiety. According to Dr. Baughmann,

> Mr. Carter shows some evidence of fearfulness of people, which is often associated with a schizophrenic individual. Indeed, there is some evidence that if the anxiety became very great and he had no way of dealing with it, that he might indeed become schizophrenic, that is, become actually psychotic.

* * * * * *

> Mr. Carter has a certain weakness in his ego, that is, in his conscious control of his behavior that makes it very difficult for him to control his impulses, the impulses that come from the more primitive or animal-like part of his personality. He does, however, have a rather strong, although not particularly effective conscience. That is, his conscience may not be strong enough to keep him from doing things that he would judge he would not want to do because they would be against his moral code but he would then tend to suffer a great deal of guilt because of what he has done.

* * * * * *

> If you are asking me is he more or less able than the average person to control his impulses, he is considera-

bly less able than the average person to control his impulses.

In Dr. Hamman's view, however, appellant was overall a fairly well-integrated individual:

> Mr. Carter's self is reasonably well intact. In fact better probably than a lot of people under stress. He had a series of unfortunate situations from about 1962 to '65 [the death of his son and breakup of his intended marriage] when he did not stand up as well against them as some people, yet a lot better than some of the others. I would say, in terms of ego strength, probably average and that's a very loose concept. I think it would stand up under psychiatric cross-examination for about two seconds.

* * * * * *

> Well, he is less impulsive, too. He is able to plan ahead. He doesn't wait until the last minute and go off impulsively and do something. He is in better control than a lot of people on the streets. For that matter, certainly, better control than probably the average addict.

* * * * * *

> Q  Is this while he is under the influence or while he is not under the influence?

> A  Well, certainly, his character structure would be the same if he were sobered up. Now, when he is in withdrawal, of course, anybody's condition in withdrawal is pretty bad but narcotics doesn't give him anything that he doesn't have. The average addict when he is under the influence of drugs is still a pretty impulsive guy because that is his basic character structure.

> Mr. Carter is not an impulsive neurotic; he is a man of an anxiety reaction who has higher intelligence, less impulsive, better able to plan than the average individual.

reactions if it wasn't so dangerous to get addicted.  * * *  I know it's an ex-

tremely good medicine except for the end results of it."

Furthermore, it was agreed that appellant was under the influence of narcotics when the robbery occurred:

> Let me point something out, too. While under the influence of drugs, by the way, and prior to withdrawal, a person's behavior controls are better than they would be when he is stone sober because drugs tend to suppress anxiety.

When questioned about the relationship between appellant's mental illness and the robbery, the psychiatrists responded with somewhat different emphasis. In Dr. Baughmann's view:

> Well, to begin with, I think Mr. Carter's drug addiction is fairly directly related to his anxiety neurosis. That is, I think that he takes the drugs because they alleviate the feeling of anxiety.

> Then the next step is—well, I will just describe it as I see it—that is, Mr. Carter has, by virtue of taking narcotics to alleviate his anxiety, become addicted to narcotics.

> Now, this means that if he doesn't get some narcotics every six to 12 hours, he feels extremely bad and has pain, suffering.

> I think that Mr. Carter stated very clearly and I have no reason to doubt that the reason he robbed the liquor store was to get money in order to buy narcotics.

> It is not specific that he had to rob a liquor store to get the narcotics but he knew, with his educational background, he would need to get the money from somewhere and this was the place where he got the money for his narcotics.

> &ast; &ast; &ast; &ast; &ast; &ast;

> Q Would he commit the crime of robbery if he were not addicted?

> A I would doubt it. I would see no other motive in his character which would specifically lead him to commit robbery.

> &ast; &ast; &ast; &ast; &ast; &ast;

> In my opinion, the relationship would be essentially the same &ast; &ast; &ast; whether he was actually in withdrawal or whether he was two or three hours away from being in withdrawal, his motives would be the same.

Dr. Hamman, on the other hand, although describing a similar process expressed far less certainty about the several elements:

> Mr. Carter has been taking drugs since 1963. Mr. Carter has had an anxiety reaction which, obviously, because of the nature of the disease goes back to adolescence.

> Now, if Mr. Carter had not had an anxiety reaction, would he have taken drugs? I don't know.

> A lot of people without anxiety reaction takes drugs. And he grew up in an environment where drugs were available.

> Nonetheless, the anxiety reaction— the anxiety was subdued initially by drugs. Of course, the evil of drug addiction is that after a while the drugs can no longer serve this effect and, of course, it has to go out.

> Mr. Carter supported his drug addiction habit by stealing.

> Now, as I say, although he did not necessarily start taking drugs initially because of the anxiety, they did give him some relief initially.

> Once he becomes addicted, he is aware that if he does not have drugs, he will go into withdrawal.

> Now, in my opinion, in the hypothetical type of situation, if a man is on the verge of going into withdrawal, I think he has almost an irresistable impulse to get drugs, to do anything to get drugs.

> Mr. Carter, at the time of this offense, was not in withdrawal symptoms. He knew that he would get them eventually, just like you and I know that if we don't eat, after a while we start to starve.

They were driving by this liquor store—this is based on Mr. Carter's testimony—they went in initially to buy some liquor and then one of them said, "We had just as well rob this place because we are going to have some money later anyway." So, they robbed it and left.

Now, as I see this, certainly they were robbing this place to get money to buy drugs but this was a robbery of convenience. They had just as well do it now. It showed a certain amount of foresight, planning. They did not do it under the stress of the moment; it was not an irresistable means [sic] at this point to rob the store.

So, again, I think the causal relationship is extremely tenuous. It's there but it is very tenuous.

\* \* \* \* \* \*

Q [Y]ou do agree that Elroy Carter took drugs to relieve pain?

A I think he did after he started using them. I don't know why he started using them.

## II.

Under our law, once a defendant has introduced some evidence that he was suffering from mental illness at the time of the offense, he must be acquitted unless the government can show beyond a reasonable doubt that the offense was not a product of a mental disease or defect.[7] In this case, the trial court sitting without a jury made specific findings of fact [8] and rejected three theories whereby it could be said that the crime in this case was the product of appellant's mental illness. I cannot say that, under present case law, this resolution was improper.

*First.* The evidence was uncontradicted that appellant was, at the time of the robbery, suffering from a mental illness, and the trial court so found.[9] It

7. Davis v. United States, 160 U.S. 469, 484, 16 S.Ct. 353, 40 L.Ed. 499 (1895) ; Adams v. United States, 134 U.S.App. D.C. 137, 141, 413 F.2d 411, 415 (1969) ; McDonald v. United States, 114 U.S.App. D.C. 120, 122, 312 F.2d 847, 849 (1962) (*en banc*) ; Tatum v. United States, 88 U.S.App.D.C. 386, 389, 190 F.2d 612, 615 (1951). *Compare* Leland v. Oregon, 343 U.S. 790, 802–807, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (Frankfurter, J., dissenting) *with* In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Of course, the less evidence introduced by the defendant with regard to the issue of responsibility, the less will be the goverment's burden in overcoming it. *See* Davis v. United States, supra, 160 U.S., at 486–488, 16 S.Ct. 353; Tatum v. United States, supra, 88 U.S. App.D.C., at 388–390, 190 F.2d 612. *Compare* Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960) (*strong showing by defendant and to* "all practical intent \* \* \* no contrary evidence"; acquittal required) *with, e. g.,* Hawkins v. United States, 114 U.S.App.D.C. 44, 310 F.2d 849 (1962) ("meager" showing by defense uncontradicted by government evidence; acquittal not required).

8. Although no specific request therefor was made by defense counsel, *see* Fed. R.Crim.P. 23(c), the trial court never-

theless preceded its verdict by an oral ruling in which it indicated the evidence upon which it relied for the verdict. I cannot commend this procedure too highly. In cases tried to a jury, of course, points of law may be preserved and examined by an examination of the instructions given the jury. In cases tried to the court, the often complex issues of law raised by the insanity defense can usually be preserved only by special findings of fact.

9. The trial court also found that "the anxiety reaction has a recognition as a mental disease from the psychiatric journals and bulletins." This, of course, is not the applicable test, for the definition of "mental disease" for the purposes of the medical profession has no necessary relationship to the meaning of "mental disease" as used in the insanity defense. As to the latter, the applicable definition is stated in McDonald v. United States, 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962) (*en banc*); *see* Washington v. United States, 129 U.S.App. D.C. 29, 36–43, 390 F.2d 444, 451–458 (1967). In the present case, however, application of an erroneous standard did not operate to the prejudice of appellant, although it may have prevented the trial court from looking as closely as it might at testimony regarding the effect of appellant's illness upon his mental processes.

rejected, however, any suggestion that the robbery came as a direct response to the tensions with which appellant was plagued. In fact, the record contains little evidence to support such a theory. Dr. Williams, the psychologist, did testify that appellant "could not cope" with the tensions within him and that, as they built up, he "would then act out"; but no effort was made to follow up this line of inquiry, and the record is bare of any indication how appellant's participation in the robbery might be regarded as the acting out of internal tensions. On the other hand, both psychiatrists indicated a view of appellant's personality inconsistent with any direct causal connection between his illness and the robbery. Dr. Baughmann testified that appellant's illness would not lead to any specific behavior pattern: he would "either suffer * * * it or tr[y] some way of getting away from it"; and that in his view, appellant's "way of getting away from it" was the taking of drugs as medicine to relieve his pain. Dr. Hamman, when questioned about the relationship of appellant's illness to his behavior, mentioned only his addiction. Furthermore,

the only symptoms of appellant's illness discussed by the psychiatrists were internal tensions which, they agreed, were substantially reduced or eliminated by his self-administered "medicine" of narcotics; and appellant's own theory of the case was that he was under the influence of drugs at the time the robbery was perpetrated.[10] Finally, Dr. Hamman several times characterized appellant's illness as "moderate,"[11] which would indicate that it did not so dominate appellant's personality as to compel a finding of productivity from the very fact of the existence of the illness.[12] In light of this testimony, I cannot say that the trial court improperly concluded that the crime was not a direct response to the anxieties from which appellant suffered.

*Second.* The trial court found that appellant was addicted to narcotics. Furthermore, the psychiatrists appeared to agree that, had appellant been on the verge of withdrawal at the time of the offense, he would have had in Dr. Hamman's words "an almost irresistable impulse to get drugs, to do anything to get drugs."[13] But appellant was several

---

10. Appellant did not testify regarding this issue, but he did state to the doctors that he was under the influence of drugs when the robbery took place. In addition, the defense elicited from the arresting officer testimony that appellant began to experience withdrawal symptoms several hours after the robbery took place.

11. Dr. Baughmann made no comparative assessment of the severity of appellant's illness.

12. In Wade v. United States, 426 F.2d 64 (9th Cir. 1969) (*en banc*), the Ninth Circuit in a thoughtful opinion adopted the American Law Institute's test of criminal responsibility as set out in Model Penal Code § 4.01(1):

A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

The majority in *Wade* had the following to say of our requirement of productivity:

The problem here is one of assumed compartmentalization of the mind, name-

ly, that the disease or defect supposedly produces some acts but not others. If the issue of insanity is raised by a defendant and the prosecution has not then negated the existence of a mental disease or defect beyond a reasonable doubt, it would seem practically impossible for the prosecution to gain conviction by a sufficient showing that the act was not the *product* of the disease or defect. In this sense, the *product* portion of the test seems superfluous.

*Wade, supra,* at 69. In consequence, the court failed to see "any important differences between the *Durham-McDonald* rule and the American Law Institute test" which it adopted. *Id.* at 69. The court viewed the question before it not as one of providing ironclad rules but rather as one of setting "sensible legal standards to guide the jury as to factors to be considered in reaching their conclusion" on the "ultimate moral issue involved in all insanity cases." *Id.* at 70 *cf.* note 20 *infra.*

13. Dr. Baughmann's testimony was that if appellant failed to obtain narcotics every 6 to 12 hours, he "feels extremely bad and has pain, suffering."

hours away from withdrawal when the robbery was committed. In Dr. Baughmann's view, this made no difference: "whether he was actually in withdrawal or whether he was two or three hours away from being in withdrawal, his motives would be the same." Dr. Hamman, however, felt that this made a substantial difference. "He knew that he would get [withdrawal] symptoms eventually, just like you and I know that if we don't eat, after a while we start to starve. * * * certainly they were robbing this place to get money to buy drugs but this was a robbery of convenience. They had just as well do it now. * * * They did not do it under the stress of the moment; it was not an irresistable means [sic] at this point to rob the store." Furthermore, he testified, while appellant was under the influence of narcotics his "behavior controls are better than they would be when he is stone sober." Basing his conclusion primarily upon Dr. Hamman's testimony in this regard, the trial court concluded that "the drug addiction as such * * * was not so closely related to the perpetration of the crime as to be a factor in that this man at the time of the perpetration was in control of his faculties. * * *" "[T]here was no compulsive or impulsive situation which caused him to do the acts which constitute the crime. He was able to plan and to execute it, and he was able to refrain." I do not find this conclusion compelled by the present record, but neither do I find it barred under our present case law. Accordingly, it may not be disturbed on appeal.

*Third.* The psychiatric testimony indicated, and the trial court so found, that narcotics served appellant as medicine for his anxieties.[14] The primary thrust of his attempt at trial to avoid criminal responsibility for the robbery was a chain of causation that led from his illness through his addiction to the robbery. This argument, however, was rejected as "too tenuous" by the trial court.

Certainly there is substantial truth in appellant's theory. Despite Dr. Hamman's speculations that appellant might have become addicted for other reasons if he had not become addicted because of his illness, the fact remains that uncontradicted testimony established the link between appellant's illness and his addiction. And given appellant's addiction, it is difficult indeed to see how it could be supported other than through criminal activity.

Yet our decisions have made clear that the question of criminal responsibility may not be answered by a simple logical leap, no matter how compelling.[15] As was said in King v. United States,[16] "The question for the jury requires the application to medical knowledge * * * of the understanding and judgment of the community as reflected in the jury." The same must be true of a district judge when he sits as trier of fact; in such cases he serves as the repository of community values as well.[17] In the present case, the trial court found that appellant at the time of the offense had that capability for choice which is a pre-

---

14. Precisely, the trial court commented: "Whether [appellant] resorted to drugs to alleviate his anxiety reaction or whether he took the drugs for some other reason is not clear upon the record." However, the only evidence on the record that could support an "other reason" for appellant's addiction was Dr. Hamman's speculation that, had appellant not suffered from anxiety, he might nevertheless have become addicted to drugs because he lived in an environment where drug addiction was common. Clearly such speculation could not support a finding, beyond a reasonable doubt, that

appellant would have become addicted regardless of the presence of mental illness. Were it necessary for decision, therefore, I would feel justified in treating the trial court's finding as being that appellant's addiction resulted directly from his use of drugs to alleviate anxiety.

15. Adams v. United States, 134 U.S.App. D.C. 137, 142, 143, 413 F.2d 411, 416–417 (1969), and cases cited.

16. 125 U.S.App.D.C. 318, 323, 372 F.2d 383, 388 (1966).

17. *Cf.* Adams v. United States, *supra* note 15.

requisite for blameworthiness. I cannot say that, in so doing, the trial court either misapplied the law or departed from community standards to such an extent that reversal would be warranted.

### III.

It is nevertheless difficult indeed to look at this record and believe that, in any real sense, appellant could have acted otherwise than he did. Of course he could have robbed another store—or a man on the street. He could have turned to pimping, or become a pusher; perhaps, with his intelligence, he could have been a successful confidence man. But his addiction alone would require $10,000 to $15,000 a year to support;[18] and the likelihood that appellant could earn this money—to say nothing of money for food and clothing—at any honest trade strikes me as vanishingly small.

If we are to assign criminal responsibility by drawing a line between those who can, and those who cannot exercise meaningful choice in their behavior, surely we mean something other than a mere choice between equally criminal alternatives. In the present case, we cannot even salve our consciences by the fiction of the voluntary addict: for appellant's addiction, on the evidence, stemmed from his need for "medicine" to alleviate the pain of his mental illness.[19] It may well be that we simply lack the resources—to say nothing of the understanding—that would be required if those who stole to feed their addiction were removed from the criminal process on the ground that they are not responsible for their actions. But if this is so, we should recognize the fact, and not rationalize our treatment of narcotics addicts on the false premise that their crimes are the result of a wrongful exercise of free will. It is to me intolerable that persons already crippled by an almost hopeless cycle of poverty, ignorance, and drugs should be further burdened by the moral stigma of guilt, *not* because they are blameworthy, but merely because we cannot afford to treat them as if they are not. If we are to maintain the insanity defense as a device for allocating criminal responsibility,[20] we should live up to its terms. If we can not do so, we should not pretend that we can.

I cannot pretend to have found a satisfactory solution even to that minuscule portion of our problems that can be affected by the criminal process. But I have no difficulty in concluding that the present system is unsatisfactory. I doubt that we have either enough jails or enough hospitals to hold this city's estimated 6,000 to 30,000 addicts.[21] Even if we did, I question whether we have enough knowledge to do anything

18. Appellant's habit required some 20 capsules of heroin per day. According to the *Washington Post*, the current price per capsule in Washington, D. C. is $1.50 to $2.00. Wash.Post, May 12, 1970, at A8 col. 1. Had appellant supported himself by stealing goods rather than cash, he would of course have to steal substantially more than $15,000 worth of goods per year in order to net $15,000.

19. I do not mean to imply that the concept of the "voluntary addict" is one that can ever contain a substantial amount of truth. *See, e. g.*, Blum, Mind-Altering Drugs and Dangerous Behavior: Narcotics, in President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Narcotics and Drug Abuse 40, 47–54 (1967). Compare the present view of alcohol addiction in Blum, Mind-Altering Drugs and Danger-

ous Behavior: Alcohol, in Task Force Report: Drunkenness 29, 30–35 (1967).

20. It is possible to view the insanity defense as a mere procedural device having no substantive content at all. That is, our jurisprudence has long recognized the power of a jury to protect defendants from the unjust application of an otherwise just law. It may well be that, regardless of the instructions juries are given, as a matter of fact they will acquit a defendant on grounds of insanity only if they are convinced that it would be unjust to treat him as a criminal. If so, then the only function of the insanity defense is to permit the medical testimony relevant to that decision to be brought before the jury.

21. Washington Post, May 12, 1970, at A1, cols. 5–6.

for them.[22]   Even if we could, we would still have to deal with the scores of new addicts that come with every new day. But I do know that our problems are not solved by sweeping them under the rug of a doctrine that saves our face by hiding our troubles.   If they are to be solved at all, they must first be brought into the open for confrontation.

**22.** See generally Cole, Report on the Treatment of Drug Addiction, in Task Force Report: Narcotics, *supra* note 19, at 135.